UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA
------------------------------------------------------------------------x
SARRI ANNE SINGER, JUDITH SINGER, ROBERT
SINGER, ERIC M. SINGER,

        Plaintiffs,

-against-

ISLAMIC REPUBLIC OF IRAN,

        Defendant.
------------------------------------------------------------------------x

Case No. 21-cv-2639

**COMPLAINT**

Plaintiffs Sarri Anne Singer, Judith Singer, Robert Singer, and Eric M. Singer, by their attorneys, allege the following:

## NATURE OF THE ACTION

1. This is a civil action pursuant to the provisions of the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 *et seq.* ("FSIA"), including the terrorism exception to sovereign immunity, 28 U.S.C. § 1605A, against the Islamic Republic of Iran ("Iran"), a designated State Sponsor of Terrorism.

2. Defendant knowingly provided material support to the U.S.-designated Foreign Terrorist Organization ("FTO")[1] Islamic Resistance Movement ("HAMAS"), which perpetrated the June 11, 2003, suicide bombing on Bus #14A on Jaffa Road in Jerusalem, Israel (the "Attack") which caused Plaintiffs' injuries.

3. The United States designated Iran a State Sponsor of Terrorism on January 19, 1984, pursuant to § 6(j) of the Export Administration Act, § 40 of the Arms Export Control Act, and § 620A of the Foreign Assistance Act. This designation has remained in effect since that time.

---

[1] As that term is defined in 8 U.S.C. § 1189.

4. The United States designated HAMAS an FTO in 1997. This designation has remained in effect since that time.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this matter and over Defendant pursuant to 28 U.S.C. §§ 1330(a), 1330(b), 1331, and 1605A(a)(1).

6. Twenty-eight U.S.C. § 1605A(c) provides a federal private right of action against a foreign state that is or was a State Sponsor of Terrorism, including its officials, employees, or agents while acting within the scope of their office, employment, or agency, for wrongful death, personal injury, and related torts.

7. Venue is proper in this District pursuant to 28 U.S.C. § 1391(f).

## THE PARTIES

### A. Plaintiffs

8. Plaintiff Sarri Anne Singer is a citizen of the United States and a resident of the State of New Jersey.

9. Plaintiff Judith Singer is a citizen of the United States and a resident of the State of New Jersey. She is the mother of Plaintiff Sarri Anne Singer.

10. Plaintiff Robert Singer is a citizen of the United States and a resident of the State of New Jersey. He is the father of Plaintiff Sarri Anne Singer.

11. Plaintiff Eric M. Singer is a citizen of the United States and a resident of the State of New Jersey. He is the brother of Plaintiff Sarri Anne Singer.

12. Each Plaintiff was a United States citizen at all relevant times, including at the time of the Attack.

### B. Defendant

13. At all times relevant to this Complaint, Defendant Iran is and was a foreign state

within the meaning of 28 U.S.C. § 1603 and a designated State Sponsor of Terrorism. Iran knowingly provided material support and resources for, and performed actions that caused, acts of extrajudicial killing and attempted extrajudicial killing within the meaning of 28 U.S.C. § 1605A, including the Attack, which caused Plaintiffs' injuries.

14.     The Government of Iran is politically and ideologically hostile to the United States and its allies and has consistently sponsored acts of international terrorism against the United States and its allies and their citizens, particularly by serving as a benefactor of Palestinian terrorist organizations, including HAMAS.

15.     Iran's support for terrorism is a key part of its attempts to spread the principles underlying its 1979 Islamic revolution throughout the region. Iran's paramilitary force, the Islamic Revolutionary Guard Corps ("IRGC"), is tasked with defending and exporting Iran's Islamic revolution. This includes providing funding, training, weapons, and other support on Iran's behalf for terrorist groups throughout the Middle East, including HAMAS.

16.     The IRGC supports terrorist groups primarily through its "Qods Force" division, ("IRGC-QF"), which was designated a Specially Designated Global Terrorist ("SDGT") by the United States pursuant to Executive Order 13,224 on October 25, 2007.

17.     On August 2, 2017, the Countering America's Adversaries Through Sanctions Act ("CAATSA") expressly extended findings relating to the IRGC-QF to the IRGC as a whole: "The IRGC, not just the IRGC–QF, is responsible for implementing Iran's international program of destabilizing activities," including "support for acts of international terrorism." Pub. L. 115-44, § 105(a)(3) (2017).

18. The U.S. Department of the Treasury designated the IRGC an SDGT under Executive Order 13,224 on October 13, 2017, for providing support for Iranian terrorism, including to HAMAS.

19. In designating the IRGC an SDGT, then-Treasury Secretary Steven T. Mnuchin said, "[t]he IRGC has played a central role to Iran becoming the world's foremost state sponsor of terror," and participated in the IRGC-QF's "support for a number of terrorist groups, including . . . Hamas."

20. The United States designated the IRGC an FTO on April 8, 2019.

21. The U.S. State Department's annual report "Patterns of Global Terrorism" (later, "Country Reports on Terrorism") states that Iran has supported HAMAS – including providing "weapons, training, and funding" – from nearly HAMAS's inception (which was in 1987) to the present day.

22. Iran "ordered" terrorist attacks on Israelis and others in Israel, and it paid HAMAS members for committing attacks.

## FACTUAL ALLEGATIONS

### A.  The Attack

23. At approximately 5:30 p.m. on June 11, 2003, Abd el-Mu'ati Shabana, a HAMAS suicide bomber dressed as an ultra-Orthodox Jew, boarded Egged Bus #14A at the Mahane Yehuda market in Jerusalem. A short while later, as the bus drove down Jaffa Road near Davidka Square, Shabana detonated his bomb, destroying the bus and killing 17 people and injuring over 100 more, including Plaintiff Sarri Anne Singer and dozens of bystanders.

24. Sarri had boarded Bus #14A in Jerusalem to meet a friend for dinner. The bus was filled with rush hour commuters. Eventually she was able to take a seat near a window.

25. Shortly thereafter, Shabana detonated his bomb only two or three seats away from

4

where Sarri was seated, killing everyone sitting and standing near her and causing the roof of the bus to fall in.

26. When the explosives were detonated, Sarri felt a shockwave across her face.

27. Sarri was struck with shrapnel from the explosion; the shrapnel entered her shoulder and broke her clavicle.

28. After the blast, she was unable to open her left eye, and she had minimal vision from her right eye.

29. Sarri was unable to hear because of a loud ringing in her ears, and both of her eardrums had ruptured.

30. Barely able to walk, Sarri was taken in an ambulance to a hospital.

31. She incurred wounds to her face and legs resulting in scarring. She underwent physical therapy.

32. Shrapnel that lodged in Sarri's gums moved her teeth and necessitated significant dental work.

33. As a result of the Attack, Sarri has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

34. Plaintiff Judith Singer, Sarri's mother, learned of the Attack when her son Eric telephoned her at work.

35. As a result of the Attack, Judith has experienced severe mental anguish and extreme emotional distress.

36. After learning of the Attack, Plaintiff Robert Singer, Sarri's father, traveled to Israel to be with his daughter.

37. As a result of the Attack, Robert has experienced severe mental anguish and extreme emotional distress.

38. Plaintiff Eric M. Singer, Sarri's brother, first learned of the Attack when he received an emergency phone call from his father while Eric was having lunch in a restaurant. After speaking with his mother and notifying his office, Eric and his father flew that night to Israel to be with Sarri.

39. As a result of the Attack, Eric has experienced severe mental anguish and extreme emotional distress.

    **B.**    **The Islamic Resistance Movement ("HAMAS")**

40. Several prominent terrorist organizations operate in Palestinian-controlled territory, most notably HAMAS.

41. HAMAS is an acronym for "Harakat al-Muqawama al-Islamiyya" – in English, the Islamic Resistance Movement – which was co-founded in the Gaza Strip in December 1987 by Sheikh Ahmed Yassin.

42. It is an offshoot of the Muslim Brotherhood, a radical Islamic group founded by Hassan al-Banna in Egypt in 1928.

43. HAMAS is a radical Islamist terrorist organization committed to the globalization of Islam through violent "jihad" (holy war).

44. It is formally committed to the destruction of the State of Israel and to achieving its objectives by violent means, including acts of terrorism. The HAMAS Charter states that HAMAS's very purpose is to create an Islamic Palestinian state throughout Israel by eliminating the State of Israel through violent jihad.

45. During the "Second Intifada" period (approximately 2000-2004), a violent uprising and terror campaign waged by various Palestinian factions against Israel, HAMAS used violence,

principally suicide bombings, shootings, and rocket attacks, and threats of violence to terrorize and demoralize Israel and solidify its political support among the Palestinian people.

46. HAMAS also uses money, including money it receives from Iran, to pay for attacks, recruit operatives, gain support in the community, and pay the families of captured or killed terrorists in order to incentivize Palestinians to commit terrorist acts.

47. On January 25, 1995, HAMAS was designated a Specially Designated Terrorist ("SDT").

48. On October 8, 1997, by publication in the Federal Register, the United States Secretary of State designated HAMAS an FTO pursuant to Section 219 of the Immigration and Nationality Act and the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996). HAMAS has continuously remained designated an FTO since 1997 and appears on the current list published by the U.S. State Department's Office of the Coordinator for Counterterrorism.[2]

49. On October 31, 2001, pursuant to Executive Order 13,224, HAMAS was designated an SDGT.

C. **HAMAS's Responsibility for the Attack**

50. On June 11, 2003, HAMAS claimed responsibility for the Attack on the official website of its military operational department that perpetrates terrorist attacks, the Izz al-Din al-Qassam Brigades ("Qassam Brigades"), identifying Shabana as the Attack's "executor," and providing biographical information about him, referring to him as a "holy warrior of [the Qassam Brigades]."

51. The same day, the Qassam Brigades also published on its official website a

---

[2] *See* https://www.state.gov/j/ct/rls/other/des/123085.htm.

biography of Shabana, whom it identified as a "Holy warrior Qassami [i.e. member of the 'Qassam Brigades']," noting that he was the "perpetrator of [the] martyrdom operation." The biography described Shabana's life up until the time that he perpetrated the Attack.

52. HAMAS also released a picture of Shabana holding two rifles and wearing a HAMAS bandana.

53. In addition, the "2007 Israel Security Agency [ISA] report on Palestinian suicide bombers" noted that HAMAS claimed responsibility for the Attack, and that an Israeli investigation after the Attack determined that the cell responsible for the Attack "was linked to the HAMAS military headquarters in Hebron."

54. Deputy HAMAS Commander in Hebron Basel al-Qawasmeh was responsible for overseeing and directing the Attack.

55. HAMAS operative Omar Mohamed Sharif was convicted by an Israeli court for his role gathering information on the bus routes in Jerusalem, purchasing clothing intended for Shabana, and transporting him to the scene of the Attack.

56. Shabana also left a "Will" that he prepared before he perpetrated the Attack identifying himself as a HAMAS operative acting on behalf of HAMAS.

57. In addition, on September 22, 2014, a federal jury in *Linde v. Arab Bank, Plc*, 04-cv-2799 (BMC)(PK) unanimously found HAMAS responsible for the Attack. On April 8, 2015, Hon. Brian M. Cogan ruled that the jury's finding regarding HAMAS's responsibility for the Attack was sufficiently supported by the evidence. *See Linde v. Arab Bank, Plc*, 97 F. Supp. 3d 287, 331 (E.D.N.Y. 2015), *vac'd on other grounds*, 882 F.3d 314 (2d Cir. 2018).

D. **Iran's Material Support for HAMAS**

58. Since shortly after HAMAS's founding in 1987, Iran has provided significant material support and resources to it, including military training, weaponry, bases for training and

8

storing weapons and explosives, safe havens, communications equipment, financial support and services, and transportation. *See* U.S. Dep't of State, Country Reports on Terrorism 2015 ("Iran has historically provided weapons, training, and funding to Hamas and other Palestinian terrorist groups . . . . These Palestinian terrorist groups have been behind a number of deaths from attacks originating in Gaza and the West Bank.").[3]

59. Iran provided this support to HAMAS pursuant to an agreement they reached in the 1980s which remains in force today. Under that agreement, HAMAS undertook to carry out acts of extrajudicial killing, hostage taking, and terrorism against Jews in Israel and the Palestinian Territories (the West Bank and Gaza), and in return Iran undertook to provide HAMAS with financial and other support to carry out such unlawful acts.

60. Iran's financial support to HAMAS is predicated on the quantity and effectiveness of HAMAS's terrorist attacks. The bulk of the funds Iran transfers to HAMAS are used to bolster HAMAS's terrorist actions and suicide missions.

61. Prior to the Attack, Iran gave substantial aid, assistance, and encouragement to HAMAS, and provided massive financial and other forms of material support to HAMAS, and thereby aided and abetted HAMAS, all with the specific intention of causing and facilitating the commission of acts of extrajudicial killing, hostage taking, and international terrorism. Iran did so with actual knowledge that HAMAS had killed and injured numerous U.S. citizens in terrorist bombings and that additional U.S. citizens and other innocent civilians would be killed and injured as a result of Iran's aiding, abetting, and provision of material support and resources to HAMAS.

62. Iran knowingly and willingly conspired, agreed, and acted in concert with HAMAS, pursuant to the common plan, design, agreement, and goals set out herein, to cause and facilitate

---

[3] Available at https://www.state.gov/j/ct/rls/crt/2015/257520.htm.

the commission of acts of extrajudicial killing, hostage taking, and international terrorism. Iran did so with actual knowledge that HAMAS had killed and injured numerous U.S. citizens in terrorist bombings and that additional U.S. citizens and other innocent civilians would be killed and injured as a result of Iran's conspiracy with HAMAS.

63. In its Patterns of Global Terrorism 2001, the State Department found that Iran "maintained [its] support for other terrorist groups, such as HAMAS and Hizballah, insisting they were national liberation movements." The report also noted that "Iran continues its firm support for Hizballah, HAMAS, and the Palestine Islamic Jihad." Moreover, the report concluded that, "Iran continued to provide Lebanese Hizballah and the Palestinian rejectionist groups—notably HAMAS, the Palestine Islamic Jihad, and the PFLP-GC—with varying amounts of funding, safehaven, training, and weapons."

64. In its Patterns of Global Terrorism 2002, the State Department found that "Iran provided … Palestinian rejectionist groups—notably HAMAS, the Palestine Islamic Jihad, and the Popular Front for the Liberation of Palestine-General Command—with funding, safehaven, training, and weapons."

65. In its Patterns of Global Terrorism 2003, the State Department found that "Iran provided … Palestinian rejectionist groups—notably HAMAS, the Palestine Islamic Jihad, and the Popular Front for the Liberation of Palestine–General Command—with funding, safehaven, training, and weapons. Iran hosted a conference in August 2003 on the Palestinian intifadah, at which an Iranian official suggested that the continued success of the Palestinian resistance depended on suicide operations."

66. In its Country Reports on Terrorism 2004, the State Department again found that Iran provided HAMAS "with funding, safehaven, training, and weapons."

67. This Court has repeatedly held that Iran is liable to victims of state-sponsored terrorism, including for terrorist acts committed by HAMAS. *See, e.g.*, *Bennett v. Islamic Republic of Iran*, 507 F. Supp. 2d 117 (D.D.C. 2007); *Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74 (D.D.C. 2006); *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258 (D.D.C. 2003); *Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286 (D.D.C. 2003); *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13 (D.D.C. 2002); *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88 (D.D.C. 2017); *Schwartz v. Islamic Republic of Iran*, No. 18-cv-1349 (RDM), 2020 WL 7042842 (D.D.C. Nov. 30, 2020).

68. Iran's financial support to HAMAS was provided continuously, routinely, and in furtherance and as implementation of a specific policy and practice established and maintained by Iran, in order to help HAMAS terrorize Israel's civilian population as well as Americans traveling in Israel, and weaken Israel's economy, social fabric, and military strength and preparedness.

69. Iran's support for HAMAS has continued to the present.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

## ASSAULT UNDER 28 U.S.C. § 1605A(c) (SARRI ANNE SINGER)

70. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

71. Iran provided material support to HAMAS intending that HAMAS would commit violent acts of terrorism in Israel, such as the Attack in which Plaintiff Sarri Anne Singer was injured, and that such attacks would cause harmful or offensive contact to HAMAS's victims and imminent apprehension of same.

72. Sarri was put in imminent apprehension of being injured or killed when Shabana detonated his explosives on Bus #14A on Jaffa Road in Jerusalem, Israel.

11

73. As detailed above, Sarri was struck with shrapnel from the explosion that entered her shoulder and broke her clavicle and sustained other injuries as a result of the Attack.

74. As a direct and foreseeable result of the Attack and Iran's support of HAMAS's terror attacks in Israel, Plaintiff Sarri Anne Singer has suffered non-pecuniary damages, including physical and emotional pain and suffering and mental anguish, and economic damages in amounts to be proven at trial.

## SECOND CLAIM FOR RELIEF

## BATTERY UNDER 28 U.S.C. § 1605A(c) (SARRI ANNE SINGER)

75. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

76. Iran provided material support to HAMAS intending that HAMAS would commit violent acts of terrorism in Israel, such as the Attack in which Plaintiff Sarri Anne Singer was injured, and that such attacks would cause harmful or offensive contact to HAMAS's victims.

77. As detailed above, Plaintiff Sarri Anne Singer received harmful or offensive contact as a direct result of the Attack.

78. As a direct and foreseeable result of the Attack and Iran's support of HAMAS's terror attacks in Israel, Plaintiff Sarri Anne Singer has suffered non-pecuniary damages, including physical and emotional pain and suffering and mental anguish, and economic damages in amounts to be proven at trial.

## THIRD CLAIM FOR RELIEF

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS UNDER 28 U.S.C. § 1605A(c) (ALL PLAINTIFFS)

79. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

80. Iran provided material support to HAMAS intending that HAMAS would commit violent acts of terrorism in Israel, such as the one that injured Plaintiffs, and that these acts of terrorism would cause severe emotional distress to any and all persons within close proximity of those attacks or those whose immediate family members experienced the attacks.

81. Each of the Plaintiffs has suffered severe emotional distress as a result of the Attack.

82. As a direct and foreseeable result of the Attack and Iran's support of HAMAS's terror attacks in Israel, each of the Plaintiffs has suffered non-pecuniary damages in amounts to be proven at trial.

83. Iran's conduct was unreasonable and outrageous and exceeds the bounds usually tolerated by decent society, and was performed willfully, maliciously, and deliberately, or with reckless indifference, to cause Plaintiffs severe mental and emotional pain, distress, anguish, and the loss of enjoyment of life.

## FOURTH CLAIM FOR RELIEF

## PUNITIVE DAMAGES UNDER 28 U.S.C. § 1605A(c) (ALL PLAINTIFFS)

84. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

85. Iran's conduct was outrageous in the extreme, wanton, willful, and malicious, and constituted a threat to the public at large, warranting an award of punitive damages in an amount sufficient to punish Iran and deter it and others from similar future wrongful conduct, pursuant to 28 U.S.C. § 1605A(c).

## FIFTH CLAIM FOR RELIEF

## PREJUDGMENT INTEREST (ALL PLAINTIFFS)

86. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

87. As described above, Iran's support for HAMAS injured Plaintiffs, warranting an award of prejudgment interest from the date of the Attack to the date of entry of judgment.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that this Court:

(a) Accept jurisdiction over this action;

(b) Enter judgment against Defendant in favor of Plaintiffs for compensatory and punitive damages in amounts to be determined at trial;

(c) Enter judgment against Defendant in favor of Plaintiffs for prejudgment interest in an amount to be determined by the Court;

(d) Enter judgment against Defendant in favor of Plaintiffs for any and all costs sustained in connection with the prosecution of this action; and

(e) Grant such other and further relief as justice requires.

Dated: October 8, 2021
Hackensack, NJ

                              **OSEN LLC**

                By    /s/ Ari Ungar
                      Ari Ungar (DC Bar No. NJ008)
                      Dina Gielchinsky (DC Bar No. NJ014)
                      190 Moore Street, Suite 272
                      Hackensack, NJ 07601
                      Tel.: (201) 265-6400
                      Fax: (201) 265-0303

                      Attorneys for Plaintiffs