UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

------------------------------------------------------------------------x

SARRI ANNE SINGER, JUDITH SINGER, ROBERT : 
SINGER, ERIC M. SINGER, :
 :
             Plaintiffs, : **Case No. 21-cv-2639 (BAH)**
 :
-against- :
 :
ISLAMIC REPUBLIC OF IRAN, :
 :
             Defendant. :

------------------------------------------------------------------------x

**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF
LAW IN SUPPORT OF THEIR MOTION FOR DEFAULT JUDGMENT**

## TABLE OF CONTENTS

I.    BACKGROUND ............................................................................................................ 2

   A.   Procedural History ............................................................................................... 2

   B.   Plaintiffs' Burden of Proof ................................................................................... 3

   C.   Evidentiary Standards ........................................................................................... 4

   D.   This Court May Judicially Notice Findings from *Linde v. Arab Bank, PLC* and *Baxter I*
        and *Baxter II*. ..................................................................................................... 5

II.   FINDINGS OF FACT ................................................................................................. 9

   A.   The June 11, 2003, Attack .................................................................................... 9

   B.   HAMAS Committed the Attack .......................................................................... 10

   C.   Iran Provided Material Support to HAMAS ....................................................... 18

III.  CONCLUSIONS OF LAW: LIABILITY ................................................................. 24

   A.   Jurisdiction Generally ......................................................................................... 24

   B.   This Court has Subject Matter Jurisdiction Over Plaintiffs' Claims .................. 25

   C.   Iran is Subject to this Court's Personal Jurisdiction .......................................... 29

   D.   Legal Standard for FSIA Default Judgment ....................................................... 30

   E.   Substantive Liability: Vicarious Liability for the Torts Committed by HAMAS ......... 32

IV.   CONCLUSIONS OF LAW: DAMAGES .................................................................. 35

   A.   Direct Injuries ..................................................................................................... 36

   B.   Solatium ............................................................................................................... 42

   C.   Punitive Damages ................................................................................................ 45

V.    CONCLUSION ........................................................................................................... 47

# TABLE OF AUTHORITIES

**Cases**

*Acosta v. Islamic Republic of Iran*,
  574 F. Supp. 2d 15 (D.D.C. 2008) ....................................................................... 34

*Akins v. Islamic Republic of Iran*,
  332 F. Supp. 3d 1 (D.D.C. 2018) ........................................................................ 37

*Allan v. Islamic Republic of Iran*,
  No. 17-cv-338 (RJL), 2019 U.S. Dist. LEXIS 85467 (D.D.C. May 21, 2019) ......................... 27

*Argentine Republic v. Amerada Hess Shipping Corp.*,
  488 U.S. 428 (1989) ....................................................................................... 24

*Baker v. Socialist People's Libyan Arab Jamahiriya*,
  775 F. Supp. 2d 48 (D.D.C. 2011) ...................................................................... 46

*Baxter v. Islamic Republic of Iran,*
  No. 11-2133 (RCL), 2019 U.S. Dist. LEXIS 243209 (D.D.C. Sept. 27, 2019) ................ *passim*

*Baxter v. Syrian Arab Republic*,
  No. 1:18-cv-1078-RCL, 2022 U.S. Dist. LEXIS 127993 (D.D.C. July 19, 2022) ....... 1, 7, 8, 10

*Beer v. Islamic Republic of Iran*,
  574 F. Supp. 2d 1 (D.D.C. 2008) ......................................................................... 8

*Belkin v. Islamic Republic of Iran*,
  667 F. Supp. 2d 8 (D.D.C. 2009) ......................................................................... 8

*Bennett v. Islamic Republic of Iran*,
  604 F. Supp. 2d 152 (D.D.C. 2009) ...................................................................... 8

*Bettis v. Islamic Republic of Iran*,
  315 F.3d 325 (D.C. Cir. 2003) ........................................................................... 31

*Bodoff v. Islamic Republic of Iran*,
  424 F. Supp. 2d 74 (D.D.C. 2006) ............................................................... 30, 33, 34

*Braun v. Islamic Republic of Iran*,
  228 F. Supp. 3d 64 (D.D.C. 2017) ................................................................... 45, 46

*Brewer v. Islamic Republic of Iran*,
  664 F. Supp. 2d 43 (D.D.C. 2009) .................................................................. 8, 29

*Campuzano v. Islamic Republic of Iran*,
281 F. Supp. 2d 258 (D.D.C. 2003) ............................................................... 3, 8, 30

*Cohen v. Islamic Republic of Iran*,
No. 12-cv-01496 (CRC), 2017 U.S. Dist. LEXIS 118770 (D.D.C. July 3, 2017) .................... 41

*Cohen v. Islamic Republic of Iran*,
No. 17-cv-1214 (JEB), 2019 U.S. Dist. LEXIS 115278 (D.D.C. July 11, 2019) ......... 30, 31, 36

*Dammarell v. Islamic Republic of Iran*,
404 F. Supp. 2d 261 (D.D.C. 2005) ..................................................................... 20

*Eisenfeld v. Islamic Republic of Iran*,
172 F. Supp. 2d 1 (D.D.C. 2000) ......................................................................... 32

*Est. of Steinberg v. Islamic Republic of Iran*,
No. 1:17-cv-1910 (RCL), 2019 U.S. Dist. LEXIS 199344 (D.D.C. Nov. 15, 2019) ................. 8

*Estate of Heiser v. Islamic Republic of Iran*,
659 F. Supp. 2d 20 (D.D.C. 2009) ....................................................................... 32

*Flanagan v. Islamic Republic of Iran*,
190 F. Supp. 3d 138 (D.D.C. 2016) ....................................................................... 5

*Flanagan v. Islamic Republic of Iran*,
87 F. Supp. 3d 93 (D.D.C. 2015) ................................................................... 45, 46

*Flatow v. Islamic Republic of Iran*,
999 F. Supp. 1 (D.D.C. 1998) ............................................................................. 34

*Foley v. Syrian Arab Republic*,
249 F. Supp. 3d 186 (D.D.C. 2017) ..................................................................... 27

*Fritz v. Islamic Republic of Iran*,
320 F. Supp. 3d 48 (D.D.C. 2018) ......................................................................... 5

*Frost v. Islamic Republic of Iran*,
383 F. Supp. 3d 33 (D.D.C. 2019) ......................................................................... 4

*Gang Luan v. United States*,
722 F.3d 388 (D.C. Cir. 2013) ............................................................................ 25

*Gill v. Islamic Republic of Iran*,
249 F. Supp. 3d 88 (D.D.C. 2017) ............................................................... 33, 34, 46

*Greenbaum v. Islamic Republic of Iran*,
    451 F. Supp. 2d 90 (D.D.C. 2006) ......................................................... 43

*Griva v. Davison*,
    637 A.2d 830 (D.C. 1994)........................................................................ 33

*Haim v. Islamic Republic of Iran*,
    425 F. Supp. 2d 56 (D.D.C. 2006) ............................................... 32, 33, 35

*Halberstam v. Welch*,
    705 F.2d 472 (D.C. Cir. 1983) ......................................................... 33, 34

*Han Kim v. Democratic People's Republic of Korea*,
    774 F.3d 1044 (D.C. Cir. 2014) ................................................................ 4

*Harrison v. Republic of Sudan*,
    882 F. Supp. 2d 23 (D.D.C. 2012) ......................................................... 8, 9

*Heiser v. Republic of Iran*,
    466 F. Supp. 2d 229 (D.D.C. 2006) ..................................................... 24, 30

*Hill v. Republic of Iraq*,
    328 F.3d 680 (D.C. Cir. 2003) ................................................................ 35

*In re Islamic Republic of Iran Terrorism Litig.*,
    659 F. Supp. 2d 31 (D.D.C. 2009) ............................................................ 31

*Kaplan v. Hezbollah*,
    213 F. Supp. 3d 27 (D.D.C. 2016) ............................................................ 37

*Karcher v. Islamic Republic of Iran*,
    396 F. Supp. 3d 12 (D.D.C. 2019) ..................................................... 26, 27, 28, 29

*Kilburn v. Socialist People's Libyan Arab Jamahiriya*,
    376 F.3d 1123 (D.C. Cir. 2004) ......................................................... 26, 27, 42

*Kim v. Democratic People's Republic of Korea*,
    87 F. Supp. 3d 286 (D.D.C. 2015) ............................................................ 45

*Kirschenbaum v. Islamic Republic of Iran*,
    572 F. Supp. 2d 200, 206 (D.D.C. 2008) ...................................................... 8

*Linde v. Arab Bank, PLC*,
    97 F. Supp. 3d 287 (E.D.N.Y. 2015)........................................................... 6

*Linde v. Arab Bank, PLC,*
  882 F.3d 314 (2d Cir. 2018) ........................................................................... 6

*Opati v. Republic of Sudan,*
  140 S. Ct. 1601 (2020) ............................................................................... 3, 45

*Oveissi v. Islamic Republic of Iran,*
  768 F. Supp. 2d 16 (D.D.C. 2011) ................................................................ 42

*Oveissi v. Islamic Republic of Iran,*
  879 F. Supp. 2d 44 (D.D.C. 2012) ................................................................ 45

*Owens v. Republic of Sudan,*
  374 F. Supp. 2d 1 (D.D.C. 2005) .................................................................. 27

*Owens v. Republic of Sudan,*
  826 F. Supp. 2d 128 (D.D.C. 2011) ........................................................... 3, 24

*Owens v. Republic of Sudan,*
  864 F.3d 751 (D.C. Cir. 2017) .............................................................. *passim*

*Peterson v. Islamic Republic of Iran,*
  515 F. Supp. 2d 25 (D.D.C. 2007) ........................................................... 36, 41

*Prevatt v. Islamic Republic of Iran,*
  421 F. Supp. 2d 152 (D.D.C. 2006) .............................................................. 35

*Rimkus v. Islamic Republic of Iran,*
  750 F. Supp. 2d 163 (D.D.C. 2010) ............................................................. 7, 9

*Roeder v. Islamic Republic of Iran,*
  333 F.3d 228 (D.D.C. 2003) ......................................................................... 30

*Roth v. Islamic Republic of Iran,*
  78 F. Supp. 3d 379 (D.D.C. 2015) ................................................................. 8

*Roth v. Syrian Arab Republic,*
  No. 14-cv-01946-RCL, 2018 U.S. Dist. LEXIS 168244 (D.D.C. Sept. 28, 2018) .................. 35

*Rothstein v. UBS AG,*
  708 F.3d 82 (2d Cir. 2013) ........................................................................... 27

*Salazar v. Islamic Republic of Iran,*
  370 F. Supp. 2d 105 (D.D.C. 2005) .............................................................. 35

*Shoham v. Islamic Republic of Iran*,
    No. 12-cv-508 (RCL), 2017 U.S. Dist. LEXIS 84119 (D.D.C. June 1, 2017) ......................... 26

*Spencer v. Islamic Republic of Iran*,
    71 F. Supp. 3d 23 (D.D.C. 2014) ................................................................. 42, 43

*Stethem v. Islamic Republic of Iran*,
    201 F. Supp. 2d 78 (D.D.C. 2002) ..................................................................... 32

*Taylor v. Islamic Republic of Iran*,
    811 F. Supp. 2d 1 (D.D.C. 2011) ........................................................................ 8

*Valencia v. Islamic Republic of Iran*,
    774 F. Supp. 2d 1 (D.D.C. 2010) ...................................................................... 37

*Valore v. Islamic Republic of Iran*,
    700 F. Supp. 2d 52 (D.D.C. 2010) ............................................................... *passim*

*Wamai v. Republic of Sudan*,
    60 F. Supp. 3d 84 (D.D.C. 2014) ...................................................................... 36

*Weinstein v. Islamic Republic of Iran*,
    184 F. Supp. 2d 13 (D.D.C. 2002) ...................................................................... 3

*Weishapl v. Sowers*,
    771 A.2d 1014 (D.C. 2001) .............................................................................. 33

*Wultz v. Islamic Republic of Iran*,
    864 F. Supp. 2d 24 (D.D.C. 2012) .................................................................... 31

**Statutes**

18 U.S.C. § 2(a) ......................................................................................... 34

18 U.S.C. § 2(b) ......................................................................................... 34

18 U.S.C. § 2339A ....................................................................................... 28

28 U.S.C. § 1330(a) .................................................................................. 24, 25

28 U.S.C. § 1330(b) .................................................................................. 24, 29

28 U.S.C. § 1602 ......................................................................................... 2

28 U.S.C. § 1604 ........................................................................................ 24

28 U.S.C. § 1605A(a)(1) ......................................................................... 24, 28, 32

28 U.S.C. § 1605A(a)(2)(A) ................................................................................... 29

28 U.S.C. § 1605A(c) ................................................................................... 25, 42

28 U.S.C. § 1605A(c)(4) ................................................................................ 30, 45

28 U.S.C. § 1605A(h)(3) ..................................................................................... 28

28 U.S.C. § 1608 ................................................................................................ 24

28 U.S.C. § 1608(a)(3) ........................................................................................ 2

28 U.S.C. § 1608(a)(4) ................................................................................... 2, 29

28 U.S.C. § 1608(c)(1) ........................................................................................ 2

28 U.S.C. § 1608(e) ................................................................................... 3, 4, 30

31 C.F.R. § 596.201 (2005) ................................................................................. 20

## Rules

Fed. R. Evid. 201 ................................................................................................. 7

Fed. R. Evid. 703 ................................................................................................. 5

## Regulations

22 C.F.R. § 126.1(d) (2006) ............................................................................... 29

31 C.F.R. § 596.201 (2015) ............................................................................... 29

Determination Pursuant to Section 6(i) of the Export Administration Act of 1979-Iran,
    49 Fed. Reg. 2836 (Jan. 23, 1984) ................................................................ 20, 29

This case arises from the personal injuries Plaintiffs – four American nationals – sustained as a result of a June 11, 2003, terrorist attack on Bus No. 14A in Jerusalem (the "Attack") committed by HAMAS with material support by Defendant Islamic Republic of Iran ("Iran").

Plaintiffs, by and through undersigned counsel, hereby submit the following proposed findings of fact and conclusions of law based on the sworn declarations of Plaintiffs and the Expert Declaration of Dr. Patrick Clawson (as well as underlying exhibits), attached to the accompanying Declaration of Ari Ungar ("Ungar Decl.") as **Exhibit A**, in support of the entry of a default judgment in this action. Plaintiffs additionally request that the Court take judicial notice of the factual record and the jury's findings of fact from *Linde v. Arab Bank, PLC*, No. 04-cv-2799 (BMC) (E.D.N.Y.), as well as the factual record and findings of fact in *Baxter v. Islamic Republic of Iran*, No. 11-cv-2133 (RCL) (D.D.C.) ("*Baxter I*"), and *Baxter v. Syrian Arab Republic*, No. 18-cv-1078 (RCL) (D.D.C.) ("*Baxter II*"), both of which took judicial notice of *Linde* when granting default judgment in those cases. *See Baxter I*, No. 11-2133 (RCL), 2019 U.S. Dist. LEXIS 243209 (D.D.C. Sept. 27, 2019), and *Baxter II*, No. 1:18-cv-1078-RCL, 2022 U.S. Dist. LEXIS 127993 (D.D.C. July 19, 2022).

To aid this Court in taking judicial notice of those cases, Plaintiffs are providing the Court with the excerpts of the Expert Report of Dr. Ronni Shaked from *Linde* which were submitted in *Baxter I*, ECF Nos. 32-1 (attached to the Ungar Declaration as **Exhibit B**) ("Shaked General Report") and 32-5 (attached to the Ungar Declaration as **Exhibit C**) ("Shaked Attack Report"), and the Declaration of Dr. Matthew Levitt submitted in *Baxter I*, concluding that without Iran's support, HAMAS could not have carried out the attacks at issue in that case, including the Attack, ECF No. 30-2 (attached to the Ungar Declaration as **Exhibit D**).

## I.   BACKGROUND

### A.   Procedural History

1.     On October 8, 2021, Plaintiffs filed their Complaint under the Terrorism Exception to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602, *et seq*. ("FSIA") in this Court. Plaintiffs sought, *inter alia*, compensation for the physical and emotional injuries that they sustained as a result of the Attack. Plaintiffs included claims for assault, battery, and intentional infliction of emotional distress. ECF No. 1.

2.     On November 10, 2021, Plaintiffs filed with the Court an affidavit requesting foreign mailing of the Summons, Complaint, and notice of suit, along with a translation of each into Farsi, upon Defendant Iran. ECF No. 8.

3.     On November 16, 2021, pursuant to 28 U.S.C. § 1608(a)(3), the Clerk of the Court certified that process was mailed by registered mail. ECF No. 10.

4.     Plaintiffs then attempted service of process on Iran via diplomatic channels pursuant to 28 U.S.C. § 1608(a)(4). On March 21, 2022, Plaintiffs made a request to the Clerk of the Court by letter to assist in transmitting the service documents. ECF No. 12. The Clerk of the Court transmitted the service documents to the State Department on March 25, 2022. ECF No. 13.

5.     The documents were transmitted to Iran's Ministry of Foreign Affairs via the Embassy of Switzerland on July 11, 2022, under cover of diplomatic note, number 1065-IE. The Iranian Ministry of Foreign Affairs returned the documents after being served, but service was thereby effective as of July 11, 2022, per 28 U.S.C. § 1608(c)(1). ECF No. 14.

6.     Defendant's answer was due on September 9, 2022. *Id.* Defendant failed to answer, move or otherwise respond by that date. No response has been made by Defendant to date.

7.     On October 19, 2022, Plaintiffs requested that the Clerk of the Court enter a default, ECF No. 15, which was entered by the Clerk of the Court on October 21, 2022, ECF No. 16. Plaintiffs now move for default judgment.

**B.     Plaintiffs' Burden of Proof**

8.     Plaintiffs are required to establish their claims "by evidence satisfactory to the court," 28 U.S.C. § 1608(e), a standard which may be satisfied "through uncontroverted factual allegations, which are supported by . . . documentary and affidavit evidence." *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 59 (D.D.C. 2010) (internal citations and quotations omitted). "This 'satisfactory to the court' standard is identical to the standard for entry of default judgments against the United States in Federal Rule of Civil Procedure 55(e)," and "[i]n evaluating the plaintiffs' proof, the court may accept as true the plaintiffs' uncontroverted evidence." *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 268 (D.D.C. 2003) (internal citations and quotations omitted).

9.     "In FSIA default judgment proceedings, the plaintiffs may establish proof by affidavit." *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 135 (D.D.C. 2011) (citing *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 19 (D.D.C. 2002)). *See also Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017), *vacated sub nom.*, *Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020):

> While both § 1608(e) and Rule 55(d) give an unresponsive sovereign some protection against an unfounded default judgment, neither provision relieves the sovereign from the duty to defend cases. Moreover, § 1608(e) does not require the court to demand more or different evidence than it would ordinarily receive; indeed, the quantum and quality of evidence that might satisfy a court can be less than that normally required.

10.     In short, the standard of Section 1608(e) is met "when the plaintiff shows her claim has some factual basis, even if she might not have prevailed in a contested proceeding." *Frost v.*

*Islamic Republic of Iran*, 383 F. Supp. 3d 33, 44 (D.D.C. 2019) (internal citations and quotations omitted). The D.C. Court of Appeals in *Owens* observed: "This lenient standard is particularly appropriate for a FSIA terrorism case, for which firsthand evidence and eyewitness testimony is difficult or impossible to obtain from an absent and likely hostile sovereign." *Owens*, 864 F.3d at 785.

### C.    Evidentiary Standards

11.    In step with the relaxed burden of proof under § 1608(e), "the district court also has an unusual degree of discretion over evidentiary rulings in a FSIA case against a defaulting state sponsor of terrorism," and appellate courts "have allowed plaintiffs to prove their claims using evidence that might not be admissible in a trial." *Owens*, 864 F.3d at 785 (citing *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1048-51 (D.C. Cir. 2014)) (noting "courts have the authority—indeed, we think, the obligation—to adjust evidentiary requirements to differing situations" and admitting affidavits in a FSIA default proceeding).

12.    A district court's "broad discretion" in such cases "extends to the admission of expert testimony, which, even in the ordinary case, does not constitute an abuse of discretion merely because the factual bases for an expert's opinion are weak." *Id*. (internal citations and quotations omitted). In sum, "[s]ection 1608(e) does not require a court to step into the shoes of the defaulting party and pursue every possible evidentiary challenge; only where the court relies upon evidence that is both clearly inadmissible and essential to the outcome has it abused its discretion. This is part of the risk a sovereign runs when it does not appear and alert the court to evidentiary problems." *Id*. at 785-86.

13.    Moreover, plaintiffs in FSIA cases frequently rely on expert testimony rather than primary evidence. Courts in this District "[r]ecogniz[e] that expert testimony is not only proper,

but often sufficient, and even indispensable in 'terrorism cases ... because firsthand evidence of terrorist activities is difficult, if not impossible to obtain.'" *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 57 (D.D.C. 2018) (citing *Owens*, 864 F.3d at 787).

14.    Experts, in turn, may rely on evidence that might not otherwise be admissible in forming their opinions. *See* Fed. R. Evid. 703 ("If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted."). Plaintiffs have done so here. *See Flanagan v. Islamic Republic of Iran*, 190 F. Supp. 3d 138, 175 (D.D.C. 2016) ("[I]n the terrorism context, experts' reliance on hearsay evidence is often critical").

15.    As detailed below, Plaintiffs proffer the sworn declarations of Plaintiffs and the Expert Declaration of Dr. Patrick Clawson, and they ask the Court to take judicial notice of findings from *Linde v. Arab Bank, PLC* and *Baxter I* and *Baxter II* to further establish that HAMAS committed the Attack and that Iran materially supported HAMAS.

### D.    This Court May Judicially Notice Findings from *Linde v. Arab Bank, PLC* and *Baxter I* and *Baxter II.*

16.    Plaintiffs Sarri Anne Singer, Judith Singer, and Eric M. Singer were also plaintiffs in *Linde*, where they brought claims against Arab Bank, PLC also arising out of their injuries sustained as a result of the Attack. *See* Compl., *Coulter v. Arab Bank, PLC*, No. 05-cv-365 (NG)(VVP) (E.D.N.Y. Jan. 21, 2005), ECF No. 1, ¶¶ 271-91. Plaintiff Robert Singer is a plaintiff in a pending related case to *Linde* against Arab Bank, PLC also arising out of his injuries sustained as a result of the Attack. *See* Am. Compl., *Miller v. Arab Bank, PLC*, No. 18-cv-2192 (BMC) (PK) (E.D.N.Y. Jul. 5, 2018), ECF No. 25, ¶¶ 175-87.

17.    The federal jury in *Linde* found that HAMAS was responsible for the 24 attacks implicated in the trial in that case, including the Attack, and that Arab Bank knowingly provided

financial services to HAMAS. *See Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287, 298-99 (E.D.N.Y. 2015), *vacated*, 882 F.3d 314 (2d Cir. 2018). Arab Bank challenged the jury's findings in two of the attacks (but not the Attack), and the court agreed that there was insufficient evidence to establish HAMAS's culpability for those two attacks. *See Linde*, 97 F. Supp. 3d at 330-31. The Second Circuit vacated the district court opinion on different grounds in *Linde v. Arab Bank, PLC*, 882 F.3d 314, 332–33 (2d Cir. 2018), rendering the plaintiffs' motion for reconsideration moot.[1]

18.      After the 2014 jury verdict in *Linde*, the plaintiffs in *Baxter I* moved for default judgment against the defendants Iran and the Iranian Ministry of Information and Security ("MOIS"), requesting that the court take judicial notice of the factual record and findings in *Linde*, as the *Baxter I* plaintiffs (all of whom were plaintiffs in cases consolidated with *Linde*) were injured in 11 of the 24 attacks included in the trial in *Linde*. *See* Plaintiffs' Memorandum of Law with Points and Authorities in Support of Plaintiffs' Renewed Motion for Entry of Default Judgment as to Liability as to all Defendants, *Baxter I*, ECF No. 30-1, at 1 n.1, 11-17 (D.D.C. Jan. 31, 2017). Those plaintiffs also submitted a Declaration of Dr. Matthew Levitt, *Baxter I*, ECF No. 30-2, listing the Attack as among the HAMAS attacks committed circa 2001-2004, and concluding that without Iran's support, HAMAS could not have carried out the attacks. *See* Ungar Decl., Ex. D at 23-24.

19.      The court in *Baxter I* asked the plaintiffs whether the Second Circuit's vacatur in *Linde* precluded it from taking judicial notice and adopting the jury verdict as to attribution of the terrorist attacks to HAMAS. The plaintiffs responded that there was no question on the appeal regarding the evidence relied upon, including as to the attribution of the attacks; rather, the Second

---

[1]      In *Linde*, Plaintiffs Sarri Anne Singer, Judith Singer, and Eric M. Singer received compensation under a sealed settlement with Arab Bank, PLC. That settlement did not assign a damages award to any of the Plaintiffs in the case. Those Plaintiffs, as well as Plaintiff Robert Singer, in the event of any recovery in *Miller*, are obligated by the U.S. Victims of State Sponsored Terrorism Fund (the "USVSST," the primary source of recovery for victims of terrorism holding FSIA judgments) to disclose the amount of that compensation when submitting their claims, if any, to the USVSST for compensation. *See* FAQ 4.8, available at http://www.usvsst.com/faq.php.

Circuit's decision related to the propriety of a jury instruction. *See* Supplemental Memorandum in Support of Plaintiffs' Renewed Motion for Default Judgment as to Liability, *Baxter I*, ECF No. 32, at 2-3 (D.D.C. Oct. 5, 2018).

20.     The court accordingly took judicial notice of the factual record and the jury's factual determinations in *Linde* in *Baxter I* and granted default judgment against Iran and the MOIS, *Baxter I*, 2019 U.S. Dist. LEXIS 243209, and again in *Baxter II*, where it granted default judgment against the Syrian Arab Republic and Syrian Air Force Intelligence, 2022 U.S. Dist. LEXIS 127993.

21.     Plaintiffs reference and identify evidence admitted in *Linde* and *Baxter* to respectfully request that the Court take judicial notice of the following findings and assist the Court in doing so:

  1.   HAMAS committed the Attack;

  2.   Iran provided material support to HAMAS during the relevant period; and

  3.   Iran is liable for the Attack.

22.     This Court may take judicial notice of both cases under Federal Rule of Evidence 201, which provides that a court "may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). "Because of the multiplicity of FSIA-related litigation in this jurisdiction, Courts in this District have thus frequently taken judicial notice of earlier, related proceedings." *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010).

23.     As relevant here, "when a court has found facts relevant to a FSIA case involving material support to terrorist groups, courts in subsequent, related cases may 'rely upon the evidence

presented in earlier litigation . . . without necessitating the formality of having that evidence reproduced.'" *Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 31 (D.D.C. 2012) (quoting *Taylor v. Islamic Republic of Iran*, 811 F. Supp. 2d 1, 7 (D.D.C. 2011)). *See also Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 54 (D.D.C. 2009) ("[r]elying on the pleadings and the . . . findings of other judges in this jurisdiction").

24.     This Court may accordingly take judicial notice of *Baxter I* and *Baxter II*, cases decided in this District which themselves referenced numerous other cases (including other cases involving the Attack) in which courts also in this District found that Iran provided material support to HAMAS during the relevant period and was liable for the terrorist attacks HAMAS committed in those cases.[2]

25.     Similarly, this Court may take judicial notice of *Linde*, a case heard outside this District. See *Baxter I*, 2019 U.S. Dist. LEXIS 243209, *6 ("Although Arab Bank was not heard in this District, the Court may still take judicial notice of its factual record and the jury's findings of fact."). To establish HAMAS's liability for the Attack in *Linde*, the *Linde* plaintiffs (represented by the same counsel as the *Singer* Plaintiffs) presented considerable evidence before and during the six-week trial, including voluminous expert reports, many dozens of trial exhibits, and

---

[2]     *See Baxter I*, 2019 U.S. Dist. LEXIS 243209, *26 ("Numerous courts within this District have found Iran and MOIS responsible for providing logistical and financial support to Hamas and have held Iran and MOIS liable for providing support under the FSIA. These findings of fact are supported by ample evidence from U.S. Government sources.") (citing *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 14 n.4 (D.D.C. 2009); *Bennett v. Islamic Republic of Iran*, 604 F. Supp. 2d 152, 154 (D.D.C. 2009); *Kirschenbaum v. Islamic Republic of Iran*, 572 F. Supp. 2d 200, 206 (D.D.C. 2008); *Campuzano*, 281 F. Supp. 2d at 262) and *Baxter II*, 2022 U.S. Dist. LEXIS 127993, at *11 ("The State Department and this Court have consistently recognized Iran's historical support for Hamas's terrorist activities.") (citing *Est. of Steinberg v. Islamic Republic of Iran*, No. 1:17-cv-1910 (RCL), 2019 U.S. Dist. LEXIS 199344, *2 (D.D.C. Nov. 15, 2019); *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 388–89 (D.D.C. 2015)). In fact, in their motion for default judgment, the *Baxter* plaintiffs cited *Beer v. Islamic Republic of Iran*, 574 F. Supp. 2d 1 (D.D.C. 2008), a case in which the court granted default judgment to different plaintiffs injured in the Attack against Iran and the MOIS. *See Baxter I*, ECF No. 30-1, at 24 ("In *Beer v. Islamic Republic of Iran*, the court found that on June 11, 2003, Hamas detonated a bomb on Egged bus No. 14A in Jerusalem, Israel. 574 F. Supp. 2d 1, 5 (D.D.C. 2008). The court found Iran liable for the attack because it provided material support to Hamas leading up to the 2003 attack.").

extensive expert and fact witness testimony. The *Baxter* court saw "no reason to doubt the accuracy or reliability of the evidence presented at the *Arab Bank* trial," noting that the "sources of information were admitted into evidence" during that trial, "which was an adversarial proceeding subject to the Federal Rules of Evidence," and that "Drs. Matthew Levitt and Ronni Shaked were permitted to testify as expert witnesses at trial as well." *Id.* at *4.

26.    While evidence need not be "reproduced," "taking *notice* of another court's finding of fact does not necessarily denote *adoption* or *finding* of that fact." *Harrison*, 882 F. Supp. 2d at 31. Instead, "courts in subsequent related cases [may] rely upon the evidence presented in [the] earlier litigation," but must still "reach their own, independent findings of fact in the cases before them." *Rimkus*, 750 F. Supp. 2d at 172.

## II.    FINDINGS OF FACT

### A.    The June 11, 2003, Attack

27.    On June 11, 2003, at approximately 5:30 p.m., a HAMAS terrorist dressed as an ultra-Orthodox Jew boarded Bus No. 14A at the Mahane Yehuda open air market. A short time thereafter, when the bus was driving down Jaffa Road, near Davidka Square, the bomber detonated the explosive charge. Seventeen people were killed and more than 100 wounded. *See* Ungar Decl., Ex. C (Expert Report of Dr. Ronni Shaked in *Linde v. Arab Bank, PLC* regarding the Attack ("Shaked Attack Report")) at 209.

28.    Plaintiff Sarri Anne Singer was a passenger on the bus, on her way to meet a friend for dinner. *See* Decl. of Sarri Singer, attached to the Ungar Declaration as **Exhibit E**, ¶ 14.

29.    The bus was full because it was rush hour, but Sarri finally found a seat near a window and sat down. *Id.* at ¶¶ 15-16.

30.    Soon afterward, Sarri felt a huge shockwave hit her body and her face. *Id.* at ¶ 18.

31.     As set forth in greater detail below, Sarri was struck with shrapnel that completely penetrated her shoulder and broke her clavicle; her left eye was swollen shut and she could barely keep her right eye open; her hair was burned, and her face was burned, bruised, and bleeding. *Id.* at ¶¶ 20-22. The effects of Sarri's physical injuries persist to the present. As described below, Sarri also sustained emotional injuries as a result of the Attack. They too still affect Sarri to the present.

### B.    HAMAS Committed the Attack

32.     To establish HAMAS's responsibility for the Attack, Plaintiffs proffer excerpts from the expert report that internationally recognized terrorism and HAMAS expert Dr. Ronni Shaked, who testified on the *Linde* plaintiffs' behalf, submitted in the *Linde* case and that Plaintiffs summarize below. Plaintiffs ask the Court to take judicial notice of the court's affirmance in that case of the jury's unanimous determination, following the six week trial, that HAMAS committed the Attack. Verdict Form, *Linde v. Arab Bank, PLC*, No. 04-cv-2799 (BMC)(PK) (E.D.N.Y. Sept. 22, 2014), ECF No. 1099. Plaintiffs note that in *Baxter v. Iran* the court took judicial notice of the *Linde* court's finding that HAMAS had committed the Attack. *See Baxter I*, 2019 U.S. Dist. LEXIS 243209, *11-12.

33.     The *Baxter* court qualified Dr. Shaked as an expert based on his "impressive credentials and knowledge of the relevant subject matter." *Baxter I*, 2019 U.S. Dist. LEXIS 243209, at *6 n.2; *Baxter II*, 2022 U.S. Dist. LEXIS 127993, at *7. Specifically, Dr. Shaked held high-ranking positions in the Israel Security Agency ("ISA") – the Israeli entity responsible for safeguarding the security of the State of Israel including the prevention of terrorism[3] – interviewed leading members of terrorist organizations including HAMAS, was a leading journalist in Israel

---

[3]     Dr. Shaked served both as Commander of the Jerusalem Sector and Commander of the Ramallah Sector. He handled agents who operated within the terrorist organizations, participated in and conducted interrogations of terrorist operatives, and participated in and commanded operations that are intended to defeat terrorist operations.

on terrorism-related matters for Israel's highest circulation newspaper, has a Ph.D.[4] with a focus on the psychological aspects of the Israeli-Palestinian conflict, has been qualified as an expert witness and submitted expert reports or declarations in numerous United States federal civil cases in addition to *Linde* and *Baxter*, and has testified at deposition or trial in multiple United States federal civil cases. *See* Ungar Decl., Ex. B (Shaked General Report) at 1.

34.    Dr. Shaked has written significant books on HAMAS, has read thousands of unclassified HAMAS-related documents, including HAMAS websites and other materials published by HAMAS, and has consulted for U.S. Government departments and agencies. *Id.* at 2, 4.

35.    Plaintiffs attach for the Court's review excerpts from the expert report that Dr. Shaked submitted in *Linde* and that formed the basis of his expert testimony and that were submitted in *Baxter*. *See* Ungar Decl., Exs. B and C. Plaintiffs set forth here a brief summary of the methodological framework Dr. Shaked relied upon as well as the evidence that he relied upon to conclude that HAMAS committed the Attack.

36.    Dr. Shaked relied upon his 13 years in the ISA, extensive years as a journalist, and work as a researcher on Palestinian extremism including HAMAS, as well as his interviews of the HAMAS leadership, including its founder and spiritual leader, Sheikh Ahmed Yassin. *See* Ungar Decl., Ex. B (Shaked General Report) at 1, 4. Dr. Shaked also interviewed senior members of the Palestinian and Israeli defense and security establishments about HAMAS. *Id.* at 4.

37.    Dr. Shaked reviewed thousands of unclassified documents including HAMAS websites and other HAMAS materials, such as leaflets, posters and postcards, in addition to Palestinian newspapers and television broadcasts, in particular, as well as newspapers and

---

[4]    At the time Dr. Shaked submitted his report in *Linde*, he was a Ph.D. candidate. He has since completed his doctoral program.

television broadcasts of the Arab world, in general. He attended funerals and public meetings of HAMAS operatives, and collected and/or examined photographs, court records, official [sworn] confessions of terrorism suspects, videotapes and recordings, documentary films and other materials, including interviews with HAMAS leaders both in and out of prison. *Id.*

38.    Dr. Shaked interviewed a number of terrorists in Israeli prisons. Most had dispatched other terrorists to commit terrorist attacks; others were potential suicide bombers or terrorists injured while committing an attack. *Id.* at 4-5. Dr. Shaked noted that the HAMAS terrorists proudly acknowledged that they had acted on HAMAS's behalf and in most cases even boasted of their actions. *Id.* at 5.

39.    In order to confirm his findings, Dr. Shaked cross-referenced sources of information by conducting interviews with HAMAS and Fatah sources and Israel and Palestinian security sources. He also relied on official written reports by the Israeli and Palestinian security establishments. *Id.*

40.    Dr. Shaked noted that HAMAS was the deadliest of the Palestinian terrorist organizations and that as a general rule it did not conceal responsibility for terrorist attacks that it perpetrated. In fact, HAMAS generally publicized its responsibility for those attacks. *Id.* In addition, in the vast majority of suicide bombings, particularly during the Second Intifada (2000-2004), the evidence establishing HAMAS's responsibility is overwhelming. *Id.* at 6.

41.    Dr. Shaked opined that during the Second Intifada, not only did HAMAS generally take credit for attacks it committed, and facilitated the broadcast of the terrorist's videotapes or photographs; it also often took complex and varied measures to promote their operatives' status as celebrities, by means of "mourners' tents," mass funerals, eulogies in the newspapers or on the Internet, posters and other means of iconography. *Id.*

42.    Dr. Shaked explained the means by which HAMAS publicized its responsibility for attacks: (1) **Public announcements** claiming responsibility for committing a terrorist attack, which could be made in written form, over the public address system of a mosque, or on the Internet. (2) **Mourning symbols and customs** include funerals in which the deceased is buried with a HAMAS flag and are attended by members of HAMAS; mourning customs associated with HAMAS include singing *anashid* (religious hymns); decorating the mourners' tent with green flags; displaying HAMAS emblems and pictures of its leaders; and finally, leaflets bearing verses from the Koran or statements by the leaders of the Muslim Brotherhood. *Id.* at 7-8. (3) **Posters and postcards** bear a photograph of the suicide bomber before he departs for the suicide attack. The suicide bomber wears a band on his forehead which discloses the terrorist organization he belongs to. HAMAS terrorists decorate their foreheads with a green band. The inscriptions on the posters and postcards also indicate the terrorist organization the suicide bomber belongs to; religious slogans are associated with HAMAS. *Id.* at 8. (4) **Photographs and confessions of the suicide bomber** include videotapes of the "Will," in which the suicide bomber, standing before HAMAS iconography, makes a speech on behalf of HAMAS and announces his intent to perpetrate the suicide bombing. *Id.* at 9. HAMAS customarily published photographs of the suicide bomber in the press. Dr. Shaked opined that the filmed evidence, followed by the identification of the body at the scene of the suicide bombing, constitutes strong evidence of the relationship between the suicide bomber and HAMAS's operational terrorist wing, the Izz al-Din al-Qassam Brigades ("Qassam Brigades"). *Id.* at 9-11. (5) **Media**, including newspapers, are published by HAMAS containing stories and photographs of its terrorist operatives. *Id.* at 11. (6) **Plaques and monuments** with the names of HAMAS suicide bombers and HAMAS symbols engraved in them attest to HAMAS's responsibility for an attack. *Id.* (7) **Israeli prisons** segregate prisoners by

terrorist organizations, and prisoners' conduct reflects which organization they belong to. *Id.* at 12.

43.    Dr. Shaked also opined that official Israeli investigations conducted by the ISA helped officially confirm which terrorist organization was responsible for a particular attack. As alluded to above, because determining which terrorist group was responsible for an attack was rarely in doubt, from a practical perspective the ISA's primary role was identifying and arresting the members of the terrorist cell that perpetrated the attack, with the objective of stopping the activity of the terrorist networks. *Id.* at 12-13.

44.    Dr. Shaked described the ISA's role in overseeing the investigation and the Israel Police's role if a criminal action was deemed necessary. In a suicide attack, the terrorist's body was collected and identified, and the accomplices and their terrorist affiliation were investigated. Most of the accomplices who were arrested did not merely confess their involvement and boast of their activities; they also provided details with regard to the planning of the attack and the identity of the organization which ordered the attack. *Id.* at 13-14.

45.    Dr. Shaked was able to cross-reference the extensive means HAMAS used to publicize its responsibility for an attack with the investigations and findings made by the ISA, Israel Police, and court system. *Id.* at 14. Specifically, the ISA and the Office of the Prime Minister released findings of attribution regarding specific terrorist attacks. *Id.*

46.    As a result of his extensive professional experience and his examination of the evidence pertaining to the Attack, Dr. Shaked opined that HAMAS "was involved in the recruiting, planning and perpetration" of the Attack. *Id.* at 16-17. As noted above, the *Linde* jury unanimously concluded that HAMAS had committed the Attack and the court affirmed that finding.

47.    As stated above, Dr. Shaked described that on June 11, 2003, at approximately 5:30 p.m., a HAMAS terrorist dressed as an ultra-Orthodox Jew boarded Bus No. 14A at the Mahane Yehuda open air market. A short time thereafter, when the bus was driving down Jaffa Road, near Davidka Square, the bomber detonated the explosive charge. Seventeen people were killed and more than 100 wounded. *See* Ungar Decl., Ex. C (Shaked Attack Report) at 209.

48.    HAMAS claimed responsibility for the Attack immediately afterward on its Qassam Brigades' official website. The announcement stated that the suicide bombing had been carried out by Abd el-Mu'ati Shabana, on behalf of the Qassam Brigades.[5] *Id.*

49.    HAMAS issued a number of photographs of Shabana after the Attack that reflect his organizational affiliation with HAMAS and his role as a suicide bomber in the Attack.[6] The pictures depict Shabana a short time before the Attack. He is wearing a band around his head inscribed with the words "There is no God but Allah" and holding a Kalashnikov rifle in both hands. *Id.*

50.    Another picture that was published on HAMAS's website shows a photo montage of a picture of Shabana with a photograph of the destruction caused by the Attack. *Id. See also id.* at 210-11 (array of pictures of Shabana). Shabana videotaped a Will in which he stated that he had carried out the Attack on behalf of the Qassam Brigades and called upon his people to continue the struggle. Shabana is wearing the HAMAS bandana. *Id.* at 211-12.

51.    Other evidence of HAMAS's responsibility for the Attack included HAMAS's official website praising Shabana's activity and devoting a long article to him, including a videotape of an interview with his mother, in which she expressed her pride at the terrorist attacks

---

[5]    https://web.archive.org/web/20090614050212/https://www.alqassam.ps/arabic/operations2.php?id=66.

[6]    https://web.archive.org/web/20110226174239/http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=picture&id=315.

which he carried out[7]; and an official HAMAS report on operations in 2003 providing information on "Operation No. 74," in which 17 Zionists were killed, with Shabana's name appearing in the report as the person who carried out the operation, and the report stating that the Qassam Brigades assumed responsibility for the Attack.[8] *Id.* at 212.

52.     Additional evidence consisted of a special report by the Qassam Brigades on the Attack noting that it was a suicide/martyrdom attack and listing its place and date and time, the number of casualties, and that it was carried out by Shabana on behalf of the Qassam Brigades[9]; an Internet forum providing details of Shabana's life history, along with a large number of pictures of him holding weapons[10]; and HAMAS's official website devoting an extensive article to Shabana that included his biography, stated that he had left a "Will," and identified him as a member of the Qassam Brigades.[11] *Id.* at 212-13.

53.     The ISA published an official report that identified Shabana as the suicide bomber and noted that HAMAS had claimed responsibility for the Attack.[12] *Id.* at 213. Judicial proceedings in Israel further substantiated HAMAS's involvement in the Attack, including that of Omar Salah Sharif, who was charged with membership in HAMAS, collecting intelligence for the Attack,

---

[7]     https://web.archive.org/web/20070627062121/http://www.palestine-info.net:80/arabic/spfiles/suhada_2005/shuhda_khaleel/3abdAlmu3ty.htm; https://web.archive.org/web/20100220084441/http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=315.

[8]     https://web.archive.org/web/20090614050212/https://www.alqassam.ps/arabic/operations2.php?id=66; https://www.alqassam.ps/arabic/المحتلة-بالقدس-14-رقم-الحافلة-تفجير/43/القسام-عمليات-معارك.

[9]     https://web.archive.org/web/20090614050212/http://www.alqassam.ps/arabic/operations2.php?id=66.

[10]     https://web.archive.org/web/20131001111505/https://www.paldf.net/forum/showthread.php?t=411196.

[11]     https://web.archive.org/web/20070627062121/http://www.palestine-info.net:80/arabic/spfiles/suhada_2005/shuhda_khaleel/3abdAlmu3ty.htm.

[12]     https://web.archive.org/web/20130321203613/https://www.shabak.gov.il/SiteCollectionImages/סקירות ופרסומים/mehablim.pdf at 25.

purchasing clothes for Shabana, dressing Shabana in an explosive belt, briefing him as to the location of the Attack, and sending him to the site of the Attack. *Id.* at 213-14.

54.    The indictment adds that Sharif patrolled Jerusalem on a No. 32 bus, in order to see whether any Arabs traveled on that line. He purchased a skullcap and ritual fringes like religious Jews wore in order to prevent Shabana's identification, and on the day of the Attack, Sharif picked up Shabana and gave him the explosive belt. *Id.* at 214.

55.    Sharif directed Shabana where to go. Shabana boarded a No. 14 bus and blew himself up. Sharif pled guilty in court to all of the charges in the indictment against him. *Id.* Sharif is imprisoned in Israel in the HAMAS section of the jail. His name was published in a list of 40 terrorists the Israeli Government will not release in any exchange of prisoners deal.[13]

56.    Bilal Sub Laban, a HAMAS cell member who was recruited by Sharif, made a confession in his own handwriting, according to which he helped to implement the terrorist attack on behalf of HAMAS; he assembled the "Jewish" clothing for Shabana, so that he would be able to avoid identification, being dressed up as an ultra-Orthodox Jew. *Id.* Laban was sentenced to nine years in prison.[14]

57.    Amar Nasser al-Din, an additional member of the cell, helped to transfer the explosive belt from Hebron to Jerusalem and was involved in the preparations for the Attack. He wrote a confession in his own handwriting, in which he described his role in the Attack. *Id.* al-Din was sentenced to seven years in prison.[15]

---

[13]    https://www.gov.il/en/departments/news/spokegovmes170309.

[14]    https://alquds-city.com/news/15018.

[15]    https://alqassam.ps/arabic/news/newsline_details/950.

58.     Dr. Shaked outlined the Hebron cell that was responsible for the Attack, which was overseen from HAMAS headquarters in Syria. *Id.* at 215. Based on all of the aforementioned evidence, Dr. Shaked concluded with "a very high degree of probability (and indeed, I have no doubt)" that HAMAS was responsible for the Attack. *Id.*

## C.     Iran Provided Material Support to HAMAS

59.     As set forth above, the *Baxter* court took judicial notice of the finding in *Linde* that HAMAS committed the Attack and also found Iran was responsible for the Attack by providing material support to HAMAS. Plaintiffs ask the Court to judicially recognize the *Linde* and *Baxter* courts' findings that HAMAS committed the Attack and the *Baxter* court's finding that Iran materially supported it.

60.     The *Baxter* plaintiffs relied upon terrorism and HAMAS expert Dr. Matthew Levitt to establish that Iran provided substantial material support during the relevant period. *See Baxter I*, ECF No. 30-1, attached to the Ungar Declaration as Ex. D, at 17-21. Dr. Levitt opined that Iran's support was necessary for HAMAS to perpetrate, *inter alia*, the Attack. *Id.* at 18, 23-24. Dr. Levitt noted that HAMAS has historically received significant financial and other support – especially training – from Iran, and that that was particularly true during the Second Intifada, which encompassed the relevant period. *Id.* at 17.

61.     Dr. Levitt testified that Iran also provides logistical support to HAMAS and military training to its members. *Id.* at 18-19. Dr. Levitt further opined that Iran's financial support is very significant and that while any support to HAMAS would contribute to its terrorist activities, Iran made contributions specifically to further HAMAS's terrorism by earmarking contributions to its Qassam Brigades. *Id.* at 18. Iran also ran terrorist training camps that HAMAS operatives participated in intended to teach the use of short-range missiles and anti-aircraft rockets. *Id.*

62.     The *Baxter* court noted that numerous courts had found Iran responsible for providing logistical and financial support to HAMAS and have found Iran liable for providing support under the FSIA. *Baxter I*, 2019 U.S. Dist. LEXIS 243209, *26. The court noted that the State Department had concluded in 2001 that "Iran encouraged Hamas and other 'Palestinian rejectionist groups' to 'escalate their activities' and provided those groups with 'varying amounts of funding, safehaven, training, and weapons.'" *Id.* The court noted that the State Department made highly similar findings in 2002, 2003, and 2004. *Id.* at *27.

63.     To further establish that Iran provided substantial material support to HAMAS during the relevant period, Plaintiffs submit a declaration from Dr. Clawson ("Clawson Decl.," attached to the Ungar Declaration as Ex. A). Dr. Clawson is an expert on Iran and has extensively studied and researched Iran and its sponsorship of terrorism, its economy, and its politics. Ungar Decl., Ex. A (Clawson Decl.), ¶ 1. He holds a Ph.D. in economics from the New School for Social Research and a B.A. from Oberlin College. *Id.*, ¶ 14. Dr. Clawson reads and speaks Persian as well as some Hebrew. *Id.* ¶ 15.

64.     Dr. Clawson is the Director of Research at the Washington Institute for Near East Policy (the "Washington Institute"), a think tank and 501(c)(3) organization that studies domestic and international issues related to the Iranian government. He has been employed there since 1997 and is responsible for supervising a staff of about 20 senior researchers who study Middle East politics and terrorism, with considerable focus on Iran. *Id.*, ¶¶ 2-4.

65.     Under Dr. Clawson's supervision, the Washington Institute's researchers have written more than 20 studies about Iran's security apparatus, support for terrorism and terror financing, political leadership, and U.S. and Western policies to counter Iranian terrorism and terror financing. He also regularly briefs and receives briefings from senior United States military

officials and senior officials of other governments friendly to the United States, about the threats

from Iran, Iranian support of terrorism, and Iranian strategy regarding terrorism. *Id.*, ¶ 5.

66.    Dr. Clawson has previously been qualified by federal courts as an expert witness

more than 30 times on issues relating to Iran, including Iran's support for terrorism and its

economy, and has given both live and written testimony in various cases brought against Iran for

its sponsorship of terrorism. *Id.*, ¶¶ 7-8. He has also testified before the House International

Relations, National Security, and Banking and Financial Services Committees and the Senate

Foreign Relations and Banking Committees about Iran, Iranian terrorism, and the use of economic

measures to discourage Iran from supporting terrorism. *Id.*, ¶ 9.

67.    Dr. Clawson has made many presentations and written and edited many books,

articles and journals about Iran, and its support of terrorism. *Id.*, ¶¶ 10-13.

68.    Iran was designated a State Sponsor of Terrorism in 1984 and has been on the State

Department's list of State Sponsors of Terrorism since that time. *Id.* ¶ 24. *See also Dammarell v.*

*Islamic Republic of Iran*, 404 F. Supp. 2d 261, 273-74 (D.D.C. 2005); 22 C.F.R. § 126.1(d) (2005);

31 C.F.R. § 596.201 (2005); Determination Pursuant to Section 6(i) of the Export Administration

Act of 1979-Iran, 49 Fed. Reg. 2836-02 (Jan. 23, 1984).

69.    HAMAS is a Palestinian terrorist organization that was established in December

1987, shortly after the outbreak of the First Intifada (December 1987 to September 1993), by

Sheikh Ahmed Yassin and other Palestinian Sunni Islamist militants committed to globalizing

jihad and destroying the State of Israel. HAMAS's founders were close to, and ideologically

aligned with, the Egyptian Muslim Brotherhood organization. Ungar Decl., Ex. A (Clawson Decl.),

¶ 25.

70.     As a result of the vast number of terrorist attacks that HAMAS perpetrated, and the hundreds of civilians (including American citizens) it killed, the United States designated HAMAS a Specially Designated Terrorist in 1995, a Foreign Terrorist Organization in 1997, and a Specially Designated Global Terrorist in 2001. *Id.*, ¶ 36.

71.     In the Second Intifada in particular, HAMAS perpetrated scores of high-profile terrorist attacks, frequently via suicide bombings. HAMAS perpetrated its attacks through the Qassam Brigades. *Id.*, ¶ 37.

72.     Dr. Clawson described the support that Iran provided to HAMAS soon after HAMAS's creation. This included Iran's allocation of $20 million in 1992-1993 to, *inter alia*, HAMAS for "Aid to the Palestinian Islamic Revolution." *Id.*, ¶ 29.

73.     In October 1992, the Iranian government invited HAMAS to Iran. Senior (and former supreme) HAMAS leader Mousa Abu-Marzuk led the HAMAS delegation. *Id.*, ¶ 30. Both the Israeli and Arab press reported that during the October 1992 meetings, Iran agreed to allow HAMAS to open an embassy in Tehran and agreed to help train fighters and provide $15 million in funding per year for two years. *Id.*, ¶ 31.

74.     A January 1993 report by the Israel Defense Forces (IDF) spokesman said, "The amount of money which reaches Hamas operatives in Judea, Samaria [those two being the Israeli term for the West Bank] and Gaza annually is estimated at one million dollars." *Id.* Dr. Clawson noted that the Iranian support was fifteen times the amount which the Israeli government estimated HAMAS had to spend on its operatives. *Id.*

75.     Dr. Clawson described the effect of Israel's expulsion in 1992 of 300 HAMAS activists from the Gaza Strip and the West Bank. The HAMAS activists ended up in Lebanon where they were brought into close contact with Iran, and HAMAS received Iranian funding as a

result. *Id.*, ¶ 34. Dr. Clawson opined that relations between Iran and HAMAS grew even tighter. *Id.*, ¶ 35. Dr. Clawson concluded that "there is credible reason to believe that Iran, in cooperation with Hezbollah, provided some of the HAMAS deportees with training about military and terrorist attacks. And Iran was supplying HAMAS with considerable funding." *Id.*

76.     Dr. Clawson described the State Department's requirement under U.S. law to provide Congress with an annual full and complete report on terrorism on countries including Iran. The list is set forth in an annual report called *"Country Reports on Terrorism"* ("CRT," previously entitled "Patterns of Global Terrorism"). Dr. Clawson noted that CRT is highly respected by researchers on terrorism, because the State Department has access to reliable intelligence sources not available to the general public and puts considerable effort into the document, making sure to double check and verify all facts and weighing each word carefully. CRT reports frequently refer to Iran's role as a sponsor of terrorism and to its support for HAMAS. *Id.*, ¶ 38.

77.     Dr. Clawson noted that from 1999 through 2003, the CRT consistently described the support Iran provided to HAMAS. Iran was described as "the most active state sponsor of terrorism," and it provided support, *inter alia*, to HAMAS. According to CRT, "Iran supported [HAMAS] with varying amounts of money, training, and weapons" and "Iran has long provided [HAMAS] with … varying amounts of funding, safehaven, training, and weapons." *Id.*

78.     Dr. Clawson opined that it has been well-documented for over 30 years that Iran has provided funding and training for terrorism operations that targeted United States and Israeli citizens, including support for HAMAS. *Id.*, ¶ 39. Even though the degree of support has varied over the years, Iran has never cut off all of its support for HAMAS. *Id.*, ¶ 40.

79.     From about 1993 until the late 1990s, the relationship was very close as a result of HAMAS's willingness to perpetrate terrorist attacks and bus bombings. Iran strongly and publicly

encouraged HAMAS to carry out such attacks. Throughout this period, HAMAS operatives received military training in Iran. *Id.*, ¶ 41. In March 1996, then-Israeli Prime Minister Shimon Peres identified Iran as the principal sponsor of HAMAS terrorism. *Id.*, ¶ 42.

80.    Dr. Clawson asserted that from about 1993 through 1996, Iran gave HAMAS millions of dollars. The money supported HAMAS's terrorist activities, *e.g.,* by bringing HAMAS into contact with potential terrorist recruits and by providing legitimate front activities behind which HAMAS could hide its terrorist activities. Iran typically paid generously for "results," which HAMAS provided by committing numerous bombings during this time. *Id.*, ¶ 44.

81.    Dr. Clawson referenced a June 2002 Canadian Secret Intelligence Service assessment, "Hamas has training camps in Iran, Lebanon, and Sudan. Hamas camps in Lebanon are said to be under Iranian supervision," *id.*, ¶ 45, as well as a November 2002 interview in which one of then-Prime Minister Ariel Sharon's most senior intelligence chiefs stated that HAMAS "kept its independence since being established in 1987, but during the last year we could see how it has been changed, and Hamas became more dependent on Iran. The leadership of Hamas sits in Damascus, and they travel every three or four weeks to Iran[,]" *id.*, ¶ 46.

82.    Dr. Clawson also quoted a July 30, 2003, Israeli Ministry of Affairs report that estimated that Iran provided HAMAS with $3 million a year. *Id.*, ¶ 47.

83.    Dr. Clawson concluded, "the Iran-Hamas relationship began before and continued during the relevant period. There is ample evidence that Iran has supplied substantial material support to Hamas, including in the period immediately before, during, and immediately after the June 11, 2003, terrorist attack on Bus #14A in Jaffa Road in Jerusalem in which 17 people were killed, and more than 100 others were injured, including Plaintiff Sarri Singer, who was seriously injured." *Id.*, ¶ 48.

### III.    CONCLUSIONS OF LAW: LIABILITY

#### A.    Jurisdiction Generally

84.    The FSIA provides the sole basis for obtaining jurisdiction over a foreign state in the United States. *See Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). Although the FSIA provides that foreign states are generally immune from jurisdiction in U.S. courts, the FSIA establishes certain exceptions in which a federal district court can obtain subject matter and personal jurisdiction over a foreign state. *See, e.g.*, *Owens*, 826 F. Supp. 2d at 148. Subject matter jurisdiction exists if the defendant's conduct falls within one of the specific statutory exceptions to immunity. *See* 28 U.S.C. §§ 1330(a), 1604. A court can obtain personal jurisdiction over a defendant if the plaintiff properly serves the defendant in accordance with 28 U.S.C. § 1608. *See* 28 U.S.C. § 1330(b).

85.    The "State-Sponsored Terrorism" exception to sovereign immunity set forth in 28 U.S.C. § 1605A provides that a foreign state waives its sovereign immunity against claims for "personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency." 28 U.S.C. § 1605A(a)(1). *See also Heiser v. Republic of Iran*, 466 F. Supp. 2d 229, 254 (D.D.C. 2006).

86.    As set forth herein, Plaintiffs have alleged that Iran provided material support or resources for the act of attempted extrajudicial killing that injured Plaintiff Sarri Anne Singer and intentionally inflicted emotional distress on her and the other Plaintiffs.

**B.      This Court has Subject Matter Jurisdiction Over Plaintiffs' Claims**

87.      United States district courts have original jurisdiction over personal injury claims against a foreign state where an exception to that state's sovereign immunity applies:

> The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title or under any applicable international agreement.

28 U.S.C. § 1330(a). This is a nonjury civil action against Iran as a legal person, not against property; therefore, Plaintiffs seek relief *in personam. Cf. Gang Luan v. United States*, 722 F.3d 388, 399 n.15 (D.C. Cir. 2013) ("In personam jurisdiction is jurisdiction over the defendant. In rem jurisdiction is jurisdiction over the property."). As explained below, this suit is against a "foreign state" that is not entitled to immunity under the state-sponsored Terrorism Exception to sovereign immunity set forth in 28 U.S.C. § 1605A(a)(1).

88.      The Terrorism Exception to the FSIA, first enacted as part of the Mandatory Victim's Restitution Act of 1996 and substantially expanded by section 1083 of the National Defense Authorization Act for Fiscal Year 2008, authorizes causes of action against foreign State Sponsors of Terrorism for "personal injury or death" arising from acts of torture, extrajudicial killing, aircraft sabotage, hostage taking, and the provision of material support for those acts. 28 U.S.C. § 1605A(c) . Here, this Court has jurisdiction because Defendant's conduct falls within the "State Sponsor of Terrorism" exception set forth in 28 U.S.C. § 1605A, and service was proper.

89.      The Terrorism Exception to foreign sovereign immunity establishes that a foreign state has no immunity "in any case … [1] in which money damages are sought [2] against a foreign state [3] for personal injury or death that was [4] caused by [5] an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or [6] the provision of material support or resources for

such an act if [7] such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency." 28 U.S.C. § 1605A(a)(1) (numbering added). Each of these requirements is met.

90.     *First*, the Complaint identifies and seeks only monetary remedies for Plaintiffs' injuries. *Second*, Defendant qualifies as a foreign state as defined by the statute. *Third*, Plaintiffs' claims are for personal injury or death. Under section 1605A, such injury or death need not be suffered directly by the claimant; instead, it "must merely be the bases of a claim for which money damages are sought." *Valore*, 700 F. Supp. 2d at 66. Jurisdiction is also not restricted to physical injury suffered directly by each claimant. *See id.* Thus, Plaintiffs' claims for physical and emotional injuries and economic losses constitute the type of claims required for jurisdiction. *See id.*

91.     *Fourth*, "jurisdictional causation" requires showing that the "material support or resources were the 'proximate cause' of Plaintiffs' personal injuries or deaths." *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 54 (D.D.C. 2019) (quoting *Owens*, 864 F.3d at 794). For instance, in *Shoham v. Islamic Republic of Iran*, this Court found that Bank Saderat's provision of material support satisfied this jurisdictional "proximate cause" standard. No. 12-cv-508 (RCL), 2017 U.S. Dist. LEXIS 84119, at *31 (D.D.C. June 1, 2017) (citing *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004)).

92.     "Proximate cause requires 'some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered.'" *Karcher*, 396 F. Supp. 3d at 54-55 (quoting *Owens*, 864 F.3d at 794). The elements of proximate cause are "[f]irst, the defendant's actions must be a 'substantial factor' in the sequence of events that led to the plaintiff's

injury," and "[s]econd, the plaintiff's injury must have been 'reasonably foreseeable or anticipated as a natural consequence' of the defendant's conduct." *Owens*, 864 F.3d at 794 (quoting *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013)). Importantly, "that material support or resources need not be '*directly* traceable to a particular terrorist act,'" *Karcher*, 396 F. Supp. 3d at 55 (quoting *Kilburn*, 376 F.3d at 1130). Finally, Plaintiffs need not show that the injuries would not have occurred "but for" Defendants' actions, as the "application of a 'but for' standard to joint tortfeasors could absolve them all…." *Kilburn*, 376 F.3d at 1129.

93.     Rather, "[i]t is enough, the D.C. Circuit held [in *Kilburn*], to show that the material support or resources went to the terrorist organization that perpetrated the act, and that the support was a 'proximate cause' of the terrorist act." *Karcher*, 396 F. Supp. 3d at 55 (quoting *Owens v. Republic of Sudan*, 374 F. Supp. 2d 1, 13 (D.D.C. 2005)). As applied to Iran in the context here, "[t]he 'substantial factor' and 'reasonable foreseeability' prongs of the proximate cause analysis are easily satisfied." *Id.* at 56-57 (quoting *Owens*, 864 F.3d at 794).

94.     Because "evidence sufficient to establish jurisdictional causation will almost always establish a theory of 'personal injury' necessary to prevail under § 1605A(c)," "most courts conduct the analysis together," *Allan v. Islamic Republic of Iran*, No. 17-cv-338 (RJL), 2019 U.S. Dist. LEXIS 85467, at *14 (D.D.C. May 21, 2019). *See also Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 205 (D.D.C. 2017) (discussing overlapping aspects of jurisdiction and liability).

95.     *Fifth*, each Plaintiff was injured as a result of the Attack, which comprises an extrajudicial killing, in which 17 people were killed. An extrajudicial killing is "a deliberate killing not authorized by a previous judgment pronounced by a regularly constituted court…." *Owens*, 864 F.3d at 770.

96.    *Sixth*, as established in *Baxter* and described by Dr. Clawson, Iran's transfer of substantial amounts of funding, safehaven, training, and weapons throughout the relevant period to HAMAS constitutes "material support" for "such acts." The FSIA defines "material support or resources," 28 U.S.C. § 1605A(h)(3), by incorporating by reference 18 U.S.C. § 2339A, which states:

> [T]he term "material support or resources" means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

97.    *Seventh*, that support was provided on Iran's behalf "by an official, employee, or agent" of Iran, 28 U.S.C. § 1605A(a)(1). Iran provided the material support through its officials and its agents. For example, as Dr. Clawson opined, Iran's provision of material support to HAMAS included Iran's use of its Islamic Revolutionary Guard Corps ("IRGC") and Ministry of Intelligence and Security ("MOIS") to help plan and execute terrorist attacks. Ungar Dec., Ex. A (Clawson Declaration) at ¶ 38. The IRGC, and its Qods Force directorate (Iran's quasi-military division used to perpetrate terrorist attacks outside of Iran), is an agent of Iran. *See, e.g.*, *Karcher*, 396 F. Supp. 3d at 55 ("The Court is satisfied that the Qods Force is at least an agent of Iran, if not a part of the government such that individuals working for it would be officials or employees of Iran."). Additionally, MOIS is "treated as the foreign state itself," and its "provision of support to Hamas would have required the approval of officials at the highest level of Iran's government." *Baxter I*, 2019 U.S. Dist. LEXIS 243209, at *34.

98.    Section 1605A also conditions subject matter jurisdiction on fulfilling three additional requirements: "The court shall hear a claim under this section if" (1) "the foreign state

was designated as a state sponsor of terrorism at the time the" terrorist attacks at issue occurred and "remains so designated when the claim is filed," (2) "the claimant or the victim was … a national of the United States [or] a member of the armed forces," and, if the attack occurred in the foreign state, (3) the foreign state was afforded the opportunity to arbitrate the claim. 28 U.S.C. § 1605A(a)(2)(A).

99.     Each of these requirements is met here. *First*, Iran was designated a State Sponsor of Terrorism in 1984 and has been so-designated since that time. *See* 22 C.F.R. § 126.1(d) (2006); 31 C.F.R. § 596.201 (2015); Determination Pursuant to Section 6(i) of the Export Administration Act of 1979-Iran, 49 Fed. Reg. 2836-02 (Jan. 23, 1984). *See also Karcher*, 396 F. Supp. 3d at 22, 54. *Second*, all of the Plaintiffs have averred to their U.S. citizenship at the time of the Attack in their declarations. *Third*, the Attack occurred in Israel, not Iran, so Iran is not entitled to the opportunity to arbitrate the dispute. Therefore, this Court has subject matter jurisdiction over claims relating to the Attack.

### C.    Iran is Subject to this Court's Personal Jurisdiction

100.     Under the FSIA, this Court has personal jurisdiction "over a foreign state . . . as to every claim for relief over which the district courts have jurisdiction under [§ 1330(a)] where service has been made under section 1608 of this title." 28 U.S.C. § 1330(b). *See also Brewer*, 664 F. Supp. 2d at 50 ("a court can obtain personal jurisdiction over a defendant if the plaintiff properly serves the defendant in accordance with 28 U.S.C. § 1608"). As described above, service of process has been effected on Defendant under 28 U.S.C. § 1608(a)(4). Accordingly, this Court has *in personam* jurisdiction over Defendant.

### D.    Legal Standard for FSIA Default Judgment

101.    In an action in which subject matter jurisdiction exists by virtue of the "Terrorism Exception" of 28 U.S.C. § 1605A, "[n]o judgment by default shall be entered by a court of the United States or of a state against a foreign state … unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e); *see also Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 232-33 (D.D.C. 2003). In default judgment cases, plaintiffs may present such evidence in the form of affidavits. *Bodoff*, 424 F. Supp. 2d at 82; *Campuzano*, 281 F. Supp. 2d at 268.

102.    Upon evaluation, the court may accept any uncontroverted evidence presented by plaintiffs as true. *Heiser*, 466 F. Supp. 2d at 255 (citing *Campuzano*, 281 F. Supp. 2d at 268). This Court accepts and credits the uncontested evidence Plaintiffs submitted as true, not only because Defendant has not objected to it, or even appeared in this action at all, but also because it is relevant and highly probative of the claims asserted.

### E. Substantive Liability

103.    The FSIA's private right of action includes claims for "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c)(4). However, Plaintiffs must provide *theories* of tort liability, as required for § 1605A claims. *See, e.g.*, *Cohen v. Islamic Republic of Iran*, No. 17-cv-1214 (JEB), 2019 U.S. Dist. LEXIS 115278, at *13 (D.D.C. July 11, 2019) ("Although § 1605A provides a private right of action, it requires plaintiffs 'to prove a theory of liability.'") (quoting *Valore*, 700 F. Supp. 2d at 73).

104.    Courts in this District in reviewing theories of liability in FSIA claims, "'rely on well-established principles of law, such as those found in Restatement (Second) of Torts,' to determine liability under the FSIA." *Id.* (citing *In re Islamic Republic of Iran Terrorism Litig.*, 659

F. Supp. 2d 31, 61 (D.D.C. 2009)). *See also Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 333 (D.C. Cir. 2003) (using Restatement "as a proxy for state common law" in determining FSIA liability).

105.    Plaintiffs present three theories of tort liability:

    a.   Assault (for Sarri Anne Singer, *See* First Claim for Relief);

    b.   Battery (for Sarri Anne Singer, *see* Second Claim for Relief); and

    c.   Intentional infliction of emotional distress (for all Plaintiffs, *see* Third Claim for Relief).

These theories are each discussed below.

106.    **Assault.** "Assault liability for attempted extrajudicial killing under the FSIA requires two conditions: '(1) [defendants] acted intending to cause a harmful contact with, or an imminent apprehension of such a contact by, those attacked[,] and (2) those attacked were thereby put in such imminent apprehension.'" *Cohen*, 2019 U.S. Dist. LEXIS 115278, *14 (quoting *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 35 (D.D.C. 2012)). Here, Iran acted "with manifest intent to cause harmful contact" to civilians and put them in imminent apprehension of harm; "indeed, such is the entire purpose of terrorism." *Id.* As explained herein, Plaintiff Sarri Anne Singer was on Egged Bus #14A when the suicide bomber detonated his explosives causing her to be in imminent apprehension of harmful contact and seriously physically injuring her.

107.    **Battery.** "[B]attery liability arises when [defendants] acted '[(1)] intending to cause a harmful or offensive contact with, or an imminent apprehension of such a contact by, those attacked and (2) a harmful contact with those attacked directly or indirectly resulted.'" *Id.* (quoting *Wultz*, 864 F. Supp. 2d at 36)). As stated above, in the Attack, Iran "both intended to cause and [its conduct] did result in harmful contact" with Plaintiff Sarri Anne Singer. As described further

below, Sarri was not only caused to be in imminent apprehension of harmful contact, but that harmful contact did in fact result, seriously physically injuring her.

108.    **Intentional infliction of emotional distress.** Under the FSIA, victims of terrorist attacks and immediate members of their families, even if not present during the attack, may bring claims for intentional infliction of emotional distress. *See Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 25-28 (D.D.C. 2009). As explained in *Heiser*, the Restatement (Second) of Torts provides a broad definition of intentional infliction of emotional distress where the wrong is "extreme and outrageous," as it is in the case of terrorism:

> Terrorism, unique among the types of tortious activities in both its extreme methods and aims, passes this test easily. As the *Stethem* court wrote, "All acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally, terror, in their targeted audience: The more extreme and outrageous, the greater the resulting distress." Indeed, as this Court put it, the "intent to create maximum emotional impact," particularly on third parties, is terrorism's *raison d'etre*.

*Id.* at 27 (quoting *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002) and *Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1, 9 (D.D.C. 2000)).

109.    The Attack—the indiscriminate blowing up of a bus killing 17 people and injuring more than 100 others—is extreme and outrageous. As further detailed below, each Plaintiff provided evidence that he or she suffered extreme emotional distress as a result of the Attack.

### E.    Substantive Liability: Vicarious Liability for the Torts Committed by HAMAS

110.    One of the substantive bases of Iran's liability is that, at a minimum, it engaged in the "provision of material support and resources" to HAMAS, which committed the Attack that caused Plaintiffs' injuries. 28 U.S.C. § 1605A(a)(1). The acts of another may render a party liable "under theories of vicarious liability, such as conspiracy, aiding and abetting and inducement." *Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56, 69 (D.D.C. 2006).

32

111.    Civil conspiracy is recognized under District of Columbia law as a basis for the imposition of vicarious liability for civil torts. It exists when the following elements are present: (1) an agreement between two or more persons or entities (2) to participate in an unlawful act or in an otherwise lawful act in an unlawful manner and (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement (4) pursuant to, and in furtherance of, the common scheme. *Griva v. Davison*, 637 A.2d 830, 848 (D.C. 1994) (citing *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983)).

112.    It is axiomatic that the "agreement" element "may be inferred from conduct." *Bodoff*, 424 F. Supp. 2d at 84 (citing *Weishapl v. Sowers*, 771 A.2d 1014, 1023 (D.C. 2001)). *See also Haim*, 425 F. Supp. 2d at 69.

113.    As this Court has previously held, "sufficient evidence [exists] for the Court to conclude that Iran's support of Hamas through 'funding and training for terrorism activities that targeted United States and Israeli citizens,' constituted an agreement to commit terrorist acts" and "established the elements of a civil conspiracy between Iran and Hamas, and thus has provided a basis of Iran's vicarious liability." *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 101 (D.D.C. 2017) (omitting citations to plaintiff Mati Gill's experts, including Dr. Patrick Clawson).

114.    Plaintiffs have established based on evidence submitted to this Court, most notably the Declaration of Dr. Patrick Clawson, that Iran and HAMAS acted in concert because they agreed to commit terrorist attacks to promote Iran's brand of revolutionary Islamic ideology and to further the goal of destroying Israel and killing Israeli and United States citizens. Such agreement may also be inferred from the substantial financial support and training that Iran provided to HAMAS. The very "[s]ponsorship of terrorist activities inherently involves a conspiracy to commit terrorist

acts." *Bodoff*, 424 F. Supp. 2d at 84 (quoting *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 27 (D.D.C. 1998)).

115.    Plaintiffs have also established based on evidence submitted to this Court, most notably the excerpts of the Expert Report of Dr. Shaked that served as the basis for his testimony in the *Linde* trial, that a HAMAS operative committed the Attack, which injured Plaintiffs. The findings in *Baxter* and Dr. Clawson's Expert Declaration also demonstrate that the torts alleged by Plaintiffs were carried out in "furtherance of the scheme" between Iran and HAMAS. For these reasons, each of the four elements of civil conspiracy is established under District of Columbia law, with regard to Iran and HAMAS. *See Gill*, 249 F. Supp. 3d at 101.

116.    Iran is also liable for aiding and abetting as well as inducement of the Attack. *See* 18 U.S.C. § 2 (a), (b). *See also Halberstam*, 705 F.2d at 481-86.[16] The D.C. Circuit in *Halberstam* described the elements of civil aiding and abetting as follows: "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation." *Id.* at 477. Plaintiffs' evidence establishes each of these elements here.

117.    *First*, Plaintiffs showed that the party that Iran aided—HAMAS—performed a wrongful act (the terrorist attack at issue) that injured Plaintiffs. *See* Ungar Decl., Ex. B (Shaked General Report) at 17; Ex. C (Shaked Attack Report); *Linde*, ECF No. 1163 at 3.

---

[16]    Where courts have analyzed Iran's vicarious liability for terrorist attacks in Israel under § 1605A, some have noted that these theories may apply, but need not be analyzed because of the applicability of conspiracy liability. *Gill*, 249 F. Supp. 3d at 101 n.6 ("Because the Court concludes that Iran is vicariously liable under a theory of civil conspiracy, it need not address these alternative theories."); *Bodoff*, 424 F. Supp. 2d at 84 (same); *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 26 (D.D.C. 2008) (same).

118.    *Second*, Iran was not only generally aware of its role in HAMAS's tortious activity at the time it provided HAMAS material support, it gave that assistance specifically to encourage acts of terrorism such as the one at issue. *See* Ungar Decl., Ex. A (Clawson Decl.), ¶¶ 39-48.

119.    *Third*, Iran knowingly and substantially assisted the terrorist attack at issue, by providing millions of dollars, weaponry, and other support for HAMAS with the specific intent of causing terrorist attacks on civilians in Israel. *See id.*

## IV.    CONCLUSIONS OF LAW: DAMAGES[17]

120.    To obtain damages against a defendant in an FSIA action, the plaintiff must prove that the consequences of the defendant's conduct were "'reasonably certain' (i.e., more likely than not) to occur, and must prove the amount of the damages by a 'reasonable estimate' consistent with this [Circuit's] application of the American rule on damages." *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115-16 (D.D.C. 2005) (quoting *Hill v. Republic of Iraq*, 328 F.3d 680, 681 (D.C. Cir. 2003) (internal quotation marks omitted)). Because there have been many cases in this District in which individuals have been injured in terrorist attacks, this Court is not writing on a proverbial "clean slate" in fashioning a damages remedy in this case.

121.    To the contrary, this Court is guided by remedial approaches and formulas utilized in similar cases. *See Prevatt v. Islamic Republic of Iran*, 421 F. Supp. 2d 152, 160 (D.D.C. 2006); *Haim*, 425 F. Supp. 2d at 71. These remedial approaches and formulas are inevitably imperfect and likely understate the damages that would be assessed against the defendant in most cases – if it contested these actions. However, as set forth below, Plaintiffs have attempted to conform the

---

[17]    Plaintiffs note that damages in the FSIA context operate according to a *sui generis* set of principles, such as conforming to certain damage frameworks or limiting awards as a matter of law. *See, e.g.*, *Roth v. Syrian Arab Republic*, No. 14-cv-01946-RCL, 2018 U.S. Dist. LEXIS 168244, at *42 (D.D.C. Sept. 28, 2018) (acknowledging "standardized approach" in FSIA cases). These principles do not necessarily reflect the kind of presentation of evidence that would occur or the measure of damages likely determined by a jury following a full trial.

evidence of Plaintiffs' injuries to the pre-existing approaches and formulas previously fashioned by Courts in this District.

### A.     Direct Injuries

122.    In an FSIA case, the court endeavors to "ensure that individuals with similar injuries receive similar awards." *Valore*, 700 F. Supp. 2d at 84 (internal quotation marks and citation omitted). To that end, this Court has developed certain frameworks setting out instructive baseline damages amounts for categories of injuries, and then departing upward or downward as necessitated by details of a particular injury or set of injuries. This Court has established different baselines. For example, "individuals suffering such physical injuries as compound fractures, severe flesh wounds, and wounds and scars from shrapnel, as well as 'lasting and severe psychological pain'" are typically "granted a baseline award of $5 million." *Id.* (quoting *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 54 (D.D.C. 2007) ("*Peterson II*")).

123.    Upward departures to $7.5–$12 million are merited "in more severe instances of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, partially lost vision and hearing, or were mistaken for dead." *Id.* Courts will grant downward departures "to $2–$3 million where victims suffered only minor shrapnel injuries or minor injury from small-arms fire." *Id*. These amounts comport with another "framework for smaller-scale, direct physical injuries" this Court developed, awarding "$2 million for plaintiffs who suffered injuries "such as lacerations and contusions caused by shrapnel, accompanied by severe emotional damages . . . ." *Cohen*, 2019 U.S. Dist. LEXIS 115278, at *18 (quoting *Wamai v. Republic of Sudan*, 60 F. Supp. 3d 84, 92 (D.D.C. 2014)).

124.    Finally, courts have awarded a baseline $1.5 million for victims of terrorist attacks who suffered psychological injuries but no physical injuries. *See, e.g.*, *Akins v. Islamic Republic*

*of Iran*, 332 F. Supp. 3d 1, 40 (D.D.C. 2018) ("victims who suffered severe emotional injury without physical injury, this Court has typically awarded the victim $1.5 million") (internal quotation marks and citation omitted).

125.    Courts consider the impact a psychological injury has on a victim following the attack. In *Valencia*, this Court awarded $5 million for (aside from a broken foot) a victim who "is currently unemployed because she couldn't work around people." *Valencia v. Islamic Republic of Iran*, 774 F. Supp. 2d 1, 17 (D.D.C. 2010) (internal quotation marks and citation omitted). *See also Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 37 (D.D.C. 2016) (departing upward to $2.5 million due to trauma preventing plaintiff from attending his local synagogue for three years and stress-induced gallbladder problems and to $2.5 million for a plaintiff who suffered trauma-related miscarriage).

**Sarri Anne Singer**

126.    Sarri Anne Singer sustained substantial physical injuries, and psychological injuries, as a result of the Attack. After Sarri sat down on Bus #14A on June 11, 2003, she felt a huge shockwave hit her body and face. *See* Ungar Decl., Ex. E (Decl. of Sarri Singer), ¶ 18. She felt like two huge pieces of metal had struck each other very hard and vibrated back. *See id.* She saw the caved in roof of the bus and the lifeless head of the man in front of her. *See id.*, ¶ 19. Sarri was struck by shrapnel from the bomb that completely penetrated her shoulder and broke her clavicle. *See id.*, ¶ 20. She could not open her left eye at all because something had hit it, and it was swollen shut; she could see very little out of her right eye and could barely keep it open. *See id.*, ¶ 21. Her hair was burned, and her face was burned, bruised, and bleeding. *See id.*, ¶ 22. Almost immediately after the bombing, both of her eardrums began ringing very loudly; she later learned that both of her eardrums had completely ruptured. *See id.*, ¶ 23. Sarri's ears began to bleed, which

continued for at least a week. *See id.*, ¶ 24. She had sustained wounds to her face, and her legs were cut up. *See id.*, ¶ 25.

127.    Sarri began screaming and was helped off the bus, as she was barely able to walk. *See id.*, ¶¶ 26-27. She was taken to Hadassah Hospital, where she stayed for 11-12 days. *See id.*, ¶ 28. She had surgery immediately on her left shoulder to clean the wound and make sure there was no serious complication from the shrapnel that entered and exited her upper back, and she received treatment for her ears and had several hearing tests while she was in the hospital. *See id.*, ¶ 29. Sarri could not sleep in the hospital; it was a very stressful and chaotic time. *See id.*, ¶ 31.

128.    After Sarri was discharged from the hospital, she returned to her apartment. It was a very difficult time as she was simultaneously experiencing the effects of a number of physical injuries – to her shoulder, ears, teeth, and body as a whole – as well as emotional injuries including acute anxiety, sadness, and worry. *See id.*, ¶ 33.

129.    Beginning in August 2003, she had physical therapy four times a week. *See id.*, ¶ 35. She continued to experience a lot of pain in her shoulder. Her shoulder injuries also significantly impacted her mobility. *See id.*, ¶ 36. In November 2003, a physical therapist noted that Sarri had suffered a sustained fracture to her shoulder as a result of the attack and that she still felt substantial pain at that time. *See id.*, ¶ 42. She remembers having substantial pain and a lot of difficulty doing things because her shoulder hurt so much and that it was very hard for her to pick anything up. *See id.*

130.    Sarri was in physical therapy for a year and a half. *See id.*, ¶ 36. She has still not regained full range of her left shoulder. *See id.* She continues to do exercises to help strengthen her arm. *See id.*

131.    Sarri had two or three additional hearing tests. *See id.*, ¶ 37. She was diagnosed as having bilateral mixed hearing loss and suffering from intermittent tinnitus. *See id.* Sarri described the pronounced hearing problems she experienced months after the Attack – she could not hear people when they called her from the next room, and she could not hear her phone even if it was right next to her. *See id.*, ¶ 41. Sarri's hearing loss persists; it is worse in her left ear. *See id.*, ¶ 38. She also still has constant ringing in her left ear. *See id.*

132.    Sarri moved back to the United States weeks after the Attack to recuperate and receive further medical treatment and returned to Israel about three months later. *See id.*, ¶¶ 34, 39. As described above, that period was marked by the Second Intifada, during which HAMAS perpetrated scores of high-profile terrorist attacks. At that time, Sarri felt an increasing amount of anxiety when she was near a bus or in a café and tried to avoid being in those situations as much as she could. *See id.*, ¶ 43. She continued to have additional hearing tests, as her hearing problems continued. *See id.*, ¶ 44.

133.    Sarri was diagnosed with Post Traumatic Stress Disorder (PTSD) with delayed onset months after the attack by EMDR specialist Dr. Gary Quinn, and she received 6-7 treatment sessions in late 2003 with Dr. Quinn. *See id.*, ¶ 45. EMDR is a rapid eye movement treatment intended to alleviate the effects of trauma. *See id.* The EMDR treatment included some counseling sessions in which Sarri discussed the attack with Dr. Quinn. *See id.*

134.    In December 2003, Dr. Quinn said that Sarri was experiencing many symptoms of PTSD and noted that she suffered substantial anxiety near buses, an increased startle reaction, and had withdrawn from some activities in life; in approximately March 2004, she was re-examined by a different psychologist, who noted that she had the same PTSD symptoms. *See id.*, ¶ 46.

135.    In February 2004, a dentist in Israel noted that one of Sarri's teeth had fractured as a result of the attack and that that had resulted in a noticeable shifting of her anterior teeth. *See id.*, ¶ 47. Sarri moved back to the United States in September 2004 and sought dental treatment there. *See id.*, ¶¶ 48-49. Her dentist noted that shrapnel had lodged in her mouth and caused her teeth to shift, which was confirmed by an oral surgeon. *See id.*, ¶ 49. She was recommended to have some of her molars removed and underwent repeated dental treatment. *See id.*, ¶¶ 49-50.

136.    In the United States, Sarri had additional physical therapy because her shoulder was still causing her pain. *See id.*, ¶ 52. She also continued receiving medical treatment for her ears. *See id.*, ¶ 53.

137.    Sarri also received further psychological treatment in the United States. She began individual psychotherapy with psychologist Dr. Judith Bram Murphy in 2006 and saw her once a week for approximately six months. She also participated in a group of fellow terrorism survivors to discuss their experiences and receive mutual support. *See id.*, ¶ 54. In May 2007, Dr. Murphy noted that Sarri was "experiencing a level of depression that was permeating [her] experiences and causing [her] distress." *Id.*, ¶ 55. Dr. Murphy noted that all of their treatment related to the attack, and probably about 75% dealt directly with the attack. *See id.*

138.    Sarri started seeing another therapist, Linda Holahan, in January 2012, and she met with her on a weekly basis for eleven years. *See id.*, ¶ 56. This past Spring, Sarri began seeing therapist Susan Miller. *See id.*

139.    Even now, when Sarri thinks about the Attack, it really upsets her. Whenever another terrorist attack occurs, it bothers her immensely and causes her to re-experience the Attack in which she was injured. *See id.*, ¶ 57.

140.    Sarri founded an organization which works on behalf of victims of terrorism and their family members, *see id.*, ¶¶ 60-61, and described herself as "gratified" that she has been able to draw upon her own terrible experiences to try and help others. *Id.*, ¶ 63. Still, the physical and emotional effects that the June 11, 2003, Attack had on Sarri were profound and remain with her to this very day. *See id.* Sarri's left shoulder, ears, and teeth have still not fully recovered, and she will always vividly carry with her the horrible memories of that terrible day. *See id.*, ¶ 64. According to Sarri, the emotional effects can still be "overpowering." *Id.*

141.    Unsurprisingly, the recent Hamas-perpetrated attack on October 7, 2023, in which the terrorist organization murdered more than 1,200 people in Israel, mostly civilians, Americans among them, and took approximately 240 hostages, has brought the June 11, 2003, Attack in which Sarri was seriously injured to the forefront of her thoughts. *See id.*, ¶ 65. She has felt very re-traumatized by the October 2023 attack. *See id.*, ¶ 66. She has been more forgetful, had difficulty focusing, and had difficulty sleeping. *See id.*

142.    Sarri's persisting physical and psychological injuries are in line with the types of injuries which warrant an award of $5 million. *See, e.g., Cohen v. Islamic Republic of Iran*, No. 12-cv-01496 (CRC), 2017 U.S. Dist. LEXIS 118770, at *48-49 (D.D.C. July 3, 2017) (awarding $5 million to plaintiff who was hospitalized for over a week after the terrorist attack, and who suffered lasting hearing impairment, scarring, and psychological injuries); *Peterson II*, 515 F. Supp. 2d at 54-56 (awarding $5 million to plaintiff with broken jaw, severe flesh wounds, scars and loss of teeth, and awarding $5 million to plaintiffs with shoulder injury resulting in persistent back, neck, and shoulder pain along with severe psychological problems). Therefore, in keeping with the cases outlined above, Plaintiffs respectfully request that the Court award Sarri Anne Singer **$5,000,000.**

### B.    Solatium

143.    The FSIA cause of action provides a solatium claim for a victim's immediate family members. *See* 28 U.S.C. § 1605A(c). Aside from the family restriction, the solatium claim operates as an IIED claim. *Valore*, 700 F. Supp. 2d at 85 ("Under the FSIA, a solatium claim is indistinguishable from an IIED claim."). This Court has established a framework for solatium claims, depending on whether the victim was killed, physically injured, or only emotionally injured, and the relationship of the claimant to the victim.

144.    For example, relatives of victims who were killed typically receive the following awards: "claims brought by spouses, parents, and siblings … $8 million, $5 million, and $2.5 million each, respectively." *Id.* Relatives of surviving, but physically injured victims typically receive the following awards: "$4 million for spouses, $2.5 million for parents, and $1.25 million for siblings."

145.    Like IIED claims for the direct victims, the Court may depart upward or downward from the solatium framework given the relevant circumstances such as, *inter alia*, "circumstances surrounding the terrorist attack which made the suffering particularly more acute or agonizing." *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 27 (D.D.C. 2011). So long as Iran's conduct proximately caused the circumstances warranting the upward departure, Iran is liable for that departure. The proximate cause requirement is not a high one, as it "normally serves to 'eliminate[] the bizarre.'" *Spencer v. Islamic Republic of Iran*, 71 F. Supp. 3d 23, 29 (D.D.C. 2014) (quoting *Kilburn*, 376 F.3d at 1128).

146.    Thus, in *Spencer*, this Court upward departed from the usual $2.5 million award for the parent of an injured victim – a U.S. Marine injured in the 1983 barracks bombing – to $3.5 million where the Marines initially told the parents their son had died. *Id.* at 29. The Court held

that "[i]n the chaos and confusion of the period after the attack, it was foreseeable that military officials tasked with responding to it might misidentify the dead and cause further emotional hardship to those intimately affected by the attack." *Id.* at 30. *See also Greenbaum v. Islamic Republic of Iran*, 451 F. Supp. 2d 90, 106 (D.D.C. 2006) (considering "factors unique to" the suffering of parents of a girl killed in a Jerusalem suicide bombing, including "a painful reminder of the attack on September 11, 2001, when terrorist attacks occurred in this country").

**The Singer Family Members**

147.    As described above, Sarri Anne Singer sustained serious physical injuries in the Attack, and as she and each of her family members set forth in their declarations, which testimony is incorporated herein, they each suffered severe mental anguish and extreme emotional distress as a result of Sarri's involvement in the Attack.

148.    All of Sarri's family members – her father, Robert Singer; mother, Judith Singer; and brother Eric Singer – testified about their love of Sarri. *See* Decl. of Robert Singer, attached to the Ungar Declaration as **Exhibit F**, ¶ 35 ("I love Sarri very much…."); Decl. of Judith Singer, attached to the Ungar Declaration as **Exhibit G**, ¶ 22 ("I can't begin to understand why anyone would do such a thing to someone I love so much."); Decl. of Eric Singer, attached to the Ungar Declaration as **Exhibit H**, ¶ 22 ("[I]t has been very upsetting to see my sister, whom I love very much….").

149.    Robert and Eric flew to Israel to be with Sarri in the hospital after the Attack, and both testified as to the impact seeing her had on them. *See* Ungar Decl., Ex. F (Decl. of Robert Singer), ¶ 19 ("It was extremely traumatic to see Sarri in the hospital bandaged up and clearly injured. I felt helpless and distraught."); Ungar Decl., Ex. H (Decl. of Eric Singer), ¶ 11 ("It was extremely difficult to see Sarri like that. I had never seen Sarri in such a helpless position."). Both

Robert and Eric testified that they spent the days during the period that Sarri was hospitalized with her. *See* Ungar Decl., Ex. F (Decl. of Robert Singer), ¶ 20; Ungar Decl., Ex. H (Decl. of Eric Singer), ¶ 12.

150.    Judith was unable to be with her daughter in Israel because her passport had expired, and testified how "very distress[ed]" and "helpless" she felt. Ungar Decl., Ex. G (Decl. of Judith Singer), ¶¶ 8-9. Judith spoke with Eric every day that he was in Israel, constantly discussing how Sarri was. *Id.*, ¶ 10. Sarri returned to the United States weeks after the attack and stayed with Judith, who described how difficult it was to witness her daughter's physical and psychological injuries. *See id.*, ¶¶ 15-16.

151.    All three of Sarri's family members testified that the Attack has caused them persisting anxiety and concern over Sarri's well-being and that the attack has been very upsetting to them, *see id.* (Decl. of Judith Singer), ¶¶ 19, 21, 22; Ungar Decl., Ex. F (Decl. of Robert Singer), ¶¶ 31-32, 34, 35; Ungar Decl., Ex. H (Decl. of Eric Singer), ¶¶ 18, 22, 26.

152.    All three of Sarri's family members also testified that the Attack has caused them lasting worries over their own safety. *See* Ungar Decl., Ex. G (Decl. of Judith Singer), ¶ 20 ("The terrorist attack has affected me greatly, in a number of ways. It is very upsetting to me to be near or on a bus. I have also developed a fear of going through tunnels."); Ungar Decl., Ex. F (Decl. of Robert Singer), ¶ 33 ("I find myself looking around more when I travel and being more cautious than I was before the attack. I generally feel more tense."); Ungar Decl., Ex. H (Decl. of Eric Singer), ¶¶ 23-24 ("[W]hile I was really afraid to go to Israel before the attack, the attack really reinforced and intensified that fear. I have also developed a fear of being in large areas and at large gatherings. When I am at certain types of events like street fairs, I become very focused on my surroundings and feel very uncomfortable. I tend to constantly look over my back and see who is

44

there. This problem was most pronounced immediately after the attack but persists to a lesser degree through the present.").

153.    Plaintiffs respectfully request the following awards for the Singer family members:

- Robert Singer: **$2,500,000**

- Judith Singer: **$2,500,000**

- Eric M. Singer: **$1,250,000**.

### C.    Punitive Damages

154.    Plaintiffs request punitive damages for their claims. *See* Compl., ¶¶ 84-85. The private right of action in the "Terrorism Exception" explicitly includes "punitive damages." 28 U.S.C. § 1605A(c)(4). Punitive damages are also available for claims arising from attacks that occurred before the addition of § 1605A to the FSIA in 2008. *Opati*, 140 S. Ct. 1601.

155.    Punitive damages "are awarded not to compensate the victims, but to 'punish outrageous behavior and deter such outrageous conduct in the future.'" *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 86 (D.D.C. 2017) (quoting *Kim v. Democratic People's Republic of Korea*, 87 F. Supp. 3d 286, 290 (D.D.C. 2015)). *See also Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 56 (D.D.C. 2012).[18]

156.    As this Court has repeatedly found, "[p]unitive damages are warranted where 'defendants supported, protected, harbored, aided, abetted, enabled, sponsored, conspired with, and subsidized a known terrorist organization whose modus operandi included the targeting,

---

[18]    This Court has credited the expert opinion that "the Iranians have shown themselves to be sensitive to punitive damages levied against them"; lesser awards could "be read by Iranian government officials as indicating a significant weakening of U.S. pressure on Iran to end its support for terrorism against Americans," whereas "substantial punitive damages . . . would be read by Iranian officials as indicating that U.S. policy remains firmly opposed to Iranian support for terrorism against Americans." *Flanagan*, 87 F. Supp. 3d at 122 (quoting the expert report Dr. Clawson submitted in that case).

brutalization, and murder of American citizens and others.'" *Braun*, 228 F. Supp. 3d at 86 (quoting *Baker v. Socialist People's Libyan Arab Jamahiriya*, 775 F. Supp. 2d 48, 85 (D.D.C. 2011)). Specifically, this Court has found that Iran's "conduct in supporting Hamas justifies the imposition of punitive damages here." *Id. See also Gill*, 249 F. Supp. 3d at 105 (relying on *Braun* to reach the same conclusion).

157.    Courts evaluate four factors to determine the propriety of awarding punitive damages:

> (1) the character of the defendant's act, (2) the nature and extent of harm to the plaintiffs that defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants.

*Flanagan*, 87 F. Supp. 3d at 119 (internal quotation marks, citation, and footnote omitted). "Courts have found these factors to be satisfied when a defendant has provided material support to a terrorist organization in carrying out an act of terrorism." *Id.*

158.    As this Court explained in *Flanagan*, this Court has frequently used two methods for quantifying punitive damages where Iran has supported terrorist attacks resulting in injuries (including death) to American citizens: (1) "multiplying the defendant state's annual expenditures on terrorism (the multiplicand) by a factor usually ranging from three to five (the multiplier)" and (2) "impos[ing] a fixed $300 million punitive award." *Id.* at 123.

159.    Courts have also used other methods. In *Gill*, where the Court found that the shooting involved was "not an exceptionally deadly attack"—no deaths occurred and "the only resulting injuries were the injuries sustained by the plaintiff"—the Court "utilize[d] a multiplicand in the same amount as the compensatory damages awarded—$7.5 million" and used a multiplier of three, resulting in a punitive damages award of $22.5 million for a single plaintiff. *Gill*, 249 F. Supp. 3d at 105-06 (internal quotation marks and citations omitted).

160.    Although the Attack was far deadlier than the attack in *Gill* – here, 17 people were killed and more than 100 others were (directly) injured – Plaintiffs seek the punitive damages framework employed in *Gill*: use of a multiplicand in the same amount as the compensatory damages awarded and a multiplier of three.

## V.    CONCLUSION

161.    Based on the foregoing, Plaintiffs respectfully request that the Court find Iran responsible for their injuries, and provide damages in the following amounts:

| Plaintiff | Compensatory award | Punitive damages |
|---|---|---|
| Sarri Singer | $5 million | $15 million |
| Robert Singer | $2.5 million | $7.5 million |
| Judith Singer | $2.5 million | $7.5 million |
| Eric Singer | $1.25 million | $3.75 million |

Dated: December 6, 2023

Respectfully submitted,

OSEN LLC

By:    /s/ Ari Ungar
Ari Ungar (DC Bar No. NJ008)
Dina Gielchinsky (DC Bar No. NJ011)
Aaron Schlanger (DC Bar No. NJ007)
190 Moore Street, Suite 272
Hackensack, NJ 07601
Tel. (201) 265-6400

*Attorneys for Plaintiffs*