**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| SARRI A. SINGER, *et al.*, | |
| Plaintiffs, | Civil Action No. 21-2639 |
| v. | Judge Beryl A. Howell |
| ISLAMIC REPUBLIC OF IRAN, | |
| Defendant. | |

**<u>MEMORANDUM OPINION</u>**

This action brought by four plaintiffs, who are U.S. citizens, arises out of the bombing on June 11, 2003 of a commuter bus, Egged Bus No. 14A, as the bus drove down Jaffa Road in Jerusalem.  Pls.' Complaint ("Compl.") ¶¶ 2, 8–11, ECF No. 1.  The explosion killed seventeen people and injured many others, including the victim-plaintiff, Sarri Anne Singer, in this case. *Id.* ¶ 23.  The remaining three plaintiffs are immediate family members of the injured victim-plaintiff.  *Id.* ¶¶ 9–11.  Plaintiffs allege that defendant, the Islamic Republic of Iran, is liable under the terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A, for its material support of Hamas terrorists that bombed the bus.  *Id.* ¶¶ 61, 67–68. Although plaintiffs have complied with the FSIA's requirements for service, Iran has failed to enter an appearance or otherwise defend against this action.  *See* 28 U.S.C. § 1608(a)(4); Return of Service/Affidavit of Summons and Complaint Executed, ECF No. 14; Clerk's Entry of Default, ECF No. 16.  Plaintiffs now seek default judgment against defendant as to liability and damages.  *See* Pls.' Mot. Default J. ("Pls.' Mot.") at 1, ECF No. 21.  For the reasons detailed below, plaintiffs' motion is granted.

## I.   BACKGROUND

Two prior decisions in federal courts have found defendant liable for the Egged Bus No. 14A bombing: *Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287 (E.D.N.Y. 2015) (Cogan, J.) and *Baxter v. Islamic Republic of Iran*, No. 11-2133 (RCL), 2019 U.S. Dist. LEXIS 243209 (D.D.C. Sept. 27, 2019) (Lamberth, J.).   The *Linde* court heard evidence and witness testimony, including expert witnesses.   *See Linde*, 97 F. Supp. 3d at 299–310.   In *Baxter*, another judge of this Court concluded that judicial notice of the findings of fact in *Linde* was appropriate, *see Baxter*, 2019 LEXIS 243209, at *8, and plaintiffs here request that this Court take judicial notice of these two prior related proceedings.   Pls.' Proposed Findings of Fact and Conclusions of L. Supp. Mot. Default J. ("Pls.' Mem.") ¶¶ 9, ECF No. 21-1.

Rule 201 of the Federal Rules of Evidence authorizes a court to "judicially notice" adjudicative facts that are "not subject to reasonable dispute because" they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."   FED. R. EVID. 201(b).[1]   Rule 201 is used frequently to take judicial notice of factual evidence developed in other FSIA proceedings "involving the same conduct by the same defendants," *Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1, 11 (D.D.C. 2018), "even when those proceedings have taken place in front of a different judge," *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 191 (D.D.C. 2017) (citing *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 54 (D.D.C. 2009)).   This avoids "the formality of having that evidence reproduced."   *Taylor v. Islamic Republic of Iran*, 811 F. Supp. 2d 1, 7 (D.D.C. 2011) (citing *Murphy v. Islamic Republic*

---

[1]   "[A]djudicative facts are simply the facts of the particular case."   *Nat'l Org. for Women, Wash., D.C. Chapter v. Soc. Sec. Admin.*, 736 F.2d 727, 737 n.95 (D.C. Cir. 1984) (Robinson, C.J., concurring) (quoting FED. R. EVID. 201(a), Advisory Committee Note).   The Rule does not govern judicial notice of "legislative fact[s]," FED. R. EVID. 201(a), which are "those which have relevance to legal reasoning and the lawmaking process, whether in the formulation of a legal principle or ruling by a judge or court or in the enactment of a legislative body," *Nat'l Org. for Women*, 736 F.2d 727 at 737 n.95 (quoting FED. R. EVID. 201, Advisory Committee Note).

*of Iran*, 740 F. Supp. 2d 51, 55 (D.D.C. 2010)); *see also Oveissi v. Islamic Republic of Iran ("Oveissi II")*, 879 F. Supp. 2d 44, 50 (D.D.C. 2012) (finding courts permitted "in subsequent related cases to rely upon the evidence presented in earlier litigation" (citation omitted)); *Est. of Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232, 237 (D.D.C. 2012) (taking "judicial notice of the evidence presented in the earlier cases").

Taking judicial notice of prior findings "does not conclusively establish the facts found in those cases" in the later FSIA case. *Foley*, 249 F. Supp. 3d at 191. Rather, "based on judicial notice of the evidence presented in the earlier cases[,] . . . courts may reach their own independent findings of fact." *Anderson v. Islamic Republic of Iran*, 753 F. Supp. 2d 68, 75 (D.D.C. 2010); *see also Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 172 (D.D.C. 2010). In fact, "courts in FSIA litigation have adopted a middle-ground approach that permits courts in subsequent related cases to rely upon the evidence presented in earlier litigation— without necessitating the formality of having that evidence reproduced—to reach their own, independent findings of fact in the cases before them." *Rimkus*, 750 F. Supp. 2d at 172.[2]

This Court is persuaded that this approach is both "efficient and sufficiently protective of the absent defendant['s] interests," *Akins*, 332 F. Supp. 3d at 11, and will therefore grant plaintiffs' request to take judicial notice of the evidence presented in *Linde* and *Baxter*. The evidence regarding the Egged Bus No. 14A bombing is summarized below, followed by an overview of the procedural history of this case.

---

[2] The D.C. Circuit has endorsed the use of judicial notice to establish facts in FSIA terrorism cases. In *Han Kim v. Democratic People's Republic of Korea*, the D.C. Circuit held that plaintiffs had "met their burden of producing evidence 'satisfactory to the court'" to establish subject matter jurisdiction under the FSIA, where the only evidence linking North Korea to the victim's disappearance was a South Korean court's conviction of a North Korean agent, of which the district court had taken judicial notice. 774 F.3d 1044, 1049 (D.C. Cir. 2014); *see also id.* 1051.

**A.  The Bus No. 14A Bombing**

Around 5:30 p.m. on June 11, 2003, a suicide bomber disguised as an "ultra-Orthodox Jew" boarded Egged Bus No. 14A, which was traveling along Jaffa Road towards downtown Jerusalem.  *See* Pls.' Mot., Ex. C, Excerpt II of the Expert Rept. of Dr. Ronni Shaked ("Shaked Rept. Excerpt II") at 209, ECF No. 21-5.  When the bus neared Davidka Square, the bomber "detonated [an] explosive charge."  *Id.*  The resulting explosion killed seventeen people and injured over 100 more.  *Id.*

**B.  Defendant Iran's Role**

Ample evidence links the Iran-backed group Hamas to the Egged Bus No. 14A bombing. *See id.* at 215 (summarizing the various ways in which Hamas publicized its responsibility for the Egged Bus No. 14A bombing).  Immediately after the attack, on its website, Hamas claimed responsibility for the bombing and both identified and praised the bomber.  *Id.* at 214.  An official 2003 Hamas operations report lists information matching the bombing.  *See id.*  The website of Hamas' military branch, the Izz al-Din al-Qassam Brigades ("Qassam Brigades"), *see* Pls.' Mot., Ex. B, Excerpt I of the Expert Rept. of Dr. Ronni Shaked ("Shaked Rept. Excerpt I") at 14 n.28, ECF No. 21-4, posted pictures depicting the bomber wearing Hamas-affiliated clothing, *see* Shaked Rep. Excerpt II at 209–11.  The bomber also filmed a "will" where he stated that he was carrying out the bombing on behalf of the Qassam Brigades.[3]  *See id.* at 211– 12.  Finally, other convicted Hamas members confessed to helping the bomber execute the Egged Bus No. 14A bombing.  *See id.* at 214–15.  Thus, there is "a very high degree of probability" that Hamas was responsible for the Egged Bus No. 14A bombing.  *Id.* at 215.

---

[3]      Leaving a "will" is a common way by which Hamas-affiliated operatives publicize their responsibility for terrorist attacks.  *See* Shaked Rept. Excerpt I at 8, 10.

Iran "has been designated a state sponsor of terrorism" by the U.S. Department of State "since January 19, 1984." *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 47 (D.D.C. 2006) (citation omitted); *see, e.g.*, *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 77 (D.D.C. 2018); U.S. Dep't of State, *State Sponsors of Terrorism*, https://www.state.gov/state-sponsors-of-terrorism/ (last visited June 13, 2024).  The *Baxter* court found that through its material support to Hamas, Iran was responsible for the Egged Bus No. 14A bombing.  *See Baxter*, 2019 LEXIS 243209, at *12–13, *27.  *Baxter* also noted that many other courts, as well as the State Department, have found Iran responsible for supporting Hamas.  *See Baxter*, 2019 LEXIS 243209, at *26.

Dr. Patrick L. Clawson, an expert on Iran, opined that Iran and Hamas have likely been linked since Hamas' founding due to similarities in ideology.  *See* Pls.' Mot., Ex. A, Decl. of Patrick L. Clawson ("Clawson Decl.") ¶¶ 28–29, ECF No. 21-3.  Clawson noted that the two grew closer due to Hamas' "willingness to perpetrate terrorist attacks and bus bombings."  *See id.* ¶ 41.  In fact, Clawson is "personally aware" that high-level Israeli and Palestinian state officials believed Iran to be the "principal sponsor" of Hamas terrorism, and believed that "Iran 'ordered' bus bombings in Israel."  *See id.* ¶ 42.  Furthermore, beyond just "strongly and publicly encourag[ing] Hamas to carry out such attacks," *see id.* ¶ 41, Iran also provided Hamas with "funding, safehaven, training, and weapons," *see id.* ¶ 38 (quoting U.S. DEP'T OF STATE, COUNTRY REPORTS ON TERRORISM), "immediately before, during, and immediately after" the Egged Bus No. 14A bombing, *see id.* ¶ 48.

**C.  The Instant Plaintiffs**

Plaintiffs in this action include one individual who suffered physical and psychological injuries from the Egged Bus No. 14A bombing and three of her immediate family members who

suffered psychological injuries.  *See* Compl. ¶¶ 8–11.  The plaintiffs and their connection to the

attack are described below.

### 1.   *Sarri Singer*

At 5:30 p.m. on June 11, 2003, Sarri Anne Singer ("Sarri") was a passenger on Egged

Bus No. 14A.  Pls.' Mot., Ex. E, Decl. of Sarri Anne Singer ("S. Singer Decl.") ¶ 14, ECF No.

21-7.  Soon after she sat down, Sarri felt "a huge shockwave" hit her, as if "two huge pieces of

metal had struck each other very hard and vibrated back."  *Id.* ¶ 18.  Later, Sarri would learn that

the "shockwave" she felt was in fact a suicide bombing.  *Id.*  After the blast, Sarri's left eye was

swollen shut, and she could see very little out of her right.  *Id.* ¶ 21.  She also could not hear, *see*

*id.* ¶ 23, as the blast also ruptured both of her eardrums, which caused her ears to bleed for "at

least a week."  *Id.* ¶¶ 23–24.  Sarri began screaming, *id.* ¶ 26, at which point someone pulled her

off the bus and stayed with her until an ambulance arrived to take her to a hospital, *see id.* ¶ 27.

At the hospital, Sarri received immediate surgery on her left shoulder, *see id.* ¶ 29, because

shrapnel from the bomb had completely penetrated it and broken her clavicle, *id.* ¶ 20.  Sarri

remained in the hospital for "11 or 12 days," *id.* ¶ 28, but she could not sleep because of the

stress and chaos of the situation, *id.* ¶ 31.  When discharged, Sarri continued to suffer from the

physical, as well as emotional, toll of the bombing, which included "acute anxiety, sadness, and

worry."  *See id.* ¶ 33.

Sarri required long-term medical care for her injuries.  *See id.* ¶¶ 35–56 (detailing the

timeline of Sarri's rehabilitative care).  She started physical therapy on her shoulder a couple

months after the bombing and stayed in therapy for "a year and a half."  *See id.* ¶¶ 35–36.  She

also required additional and repeated treatment for her ears, *see id.* ¶ 44, and her teeth, after

dentists discovered shrapnel lodged in her gums, *see id.* ¶¶ 49–51.  Sarri also pursued

psychological counseling, due to her experiencing "many symptoms of PTSD," *see id.* ¶ 46, with

one of her therapists noting that "all of [Sarri's] treatment related to the attack," *see id.* ¶ 55.  To this day, Sarri still has not regained full use of her shoulder, ears, and teeth, and continues to be affected psychologically by the attack, *see id.* ¶¶ 57, 63, effects which sometimes manifest as increased forgetfulness, difficulty focusing, and difficulty sleeping, *see id.* ¶ 66.

### 2. *Robert Singer*

On June 11, 2003, Robert Singer ("Robert") received a phone call informing him that Sarri, his daughter, had been injured in a terrorist attack.  *See* Pls.' Mot., Ex. F, Decl. of Robert Singer ("R. Singer Decl.") ¶¶ 2, 12, ECF No. 21-8.  Robert received no additional information from that call, which was "very stressful and emotionally draining."  *See id.* ¶ 13.  He later spoke to staff at the hospital where Sarri was being treated and learned that she had to undergo surgery. *See id.* ¶ 15.  Robert and his son, Sarri's brother Eric, *see id.* ¶ 2, flew to Israel that day to be with Sarri, *see id.* ¶ 16.

When Robert reached the hospital, "it was bedlam."  *Id.* ¶ 17.  Seeing Sarri "bandaged up and clearly injured" was "extremely traumatic" for Robert.  *Id.* ¶ 19.  He felt "useless" being unable to help Sarri other than provide her with emotional support.  *Id.*  Robert also felt unhappy with Sarri's decision to remain in and eventually return to Israel after the attack, as he feared she could be injured again.  *See id.* ¶¶ 22, 29.

Robert and Sarri have a close relationship, *see id.* ¶ 10, so Sarri's injuries had a "significant impact" on Robert. *See id.* ¶¶ 35–36.  Robert is now generally more concerned about the safety of his children than he was before the attack, *see id.* ¶ 31, and is "extremely worried" when he unexpectedly does not hear from them, *id.*  Whenever Sarri visits Israel, Robert becomes particularly worried.  *See id.* ¶ 32.  Overall, Robert is now more tense and cautious, *see id.* ¶ 33, and sometimes wakes up at night worrying about his children, *id.* ¶ 34.

### 3.  Eric Singer

On June 11, 2003, Eric Singer ("Eric") received a call from his father and learned that his sister, Sarri, had been injured by a terrorist attack.  Pls.' Mot., Ex. H, Decl. of Eric Singer ("E. Singer Decl.") ¶ 6, ECF No. 21-10.  Eric and his father travelled to Israel that same day to be with Sarri.  *See id.* ¶ 10.  When they got to the hospital, Eric found it "extremely difficult" to see Sarri "helpless," and "bandaged and [with] visible injuries on her face and legs."  *See id.* ¶ 11.  Eric was also reluctant and anxious to return to the United States without Sarri, as he feared that she would fall victim to other terrorist attacks.  *See id.* ¶¶ 14, 18.

Due to the continued effects of her injuries, Eric worries about Sarri's "wellbeing and general safety."  *See id.* ¶¶ 26–27.  On top of his concerns over Sarri, the attack has also affected Eric's daily life.  *See id.* ¶ 24.  It "reinforced and intensified" Eric's fear of visiting Israel.  *Id.* He also "developed a fear of being in large areas and at large gatherings."  *Id.* ¶ 25.  He cannot relax in these environments, and "constantly look[s] over [his] back [to] see who is there."  *See id.*  Although this fear was most severe following the attack, it persists to this day.  *Id.*

### 4.  Judith Singer

On June 11, 2003, Judith Singer ("Judith") received a phone call from her son Eric informing her that her daughter Sarri had been injured in a bus bombing in Israel.  Pls.' Mot., Ex. G, Decl. of Judith Singer ("J. Singer Decl.") ¶¶ 5–6, ECF No. 21-9.  Eric told her that he and his father, Judith's former husband, were traveling to Israel to be with Sarri.  *Id.* ¶ 8.  Judith wanted to travel with them, but could not because her passport had expired.  *Id.* ¶ 8.  Her inability to see and comfort Sarri at "the worst moment" in Sarri's life greatly distressed Judith.  *See id.* ¶ 9. Judith could not directly call Sarri, so she could only get updates on Sarri's condition by calling her son.  *See id.* ¶¶ 10, 12.  Receiving indirect instead of first-hand impressions about the scope of Sarri's injuries was also difficult for Judith.  *See id.* ¶ 13.

While Judith was "grateful" that Sarri survived, she was "devastated" that Sarri had been injured. *See id.* ¶ 13. When she was finally able to be together, seeing the injuries that Sarri had suffered was difficult for Judith. *Id.* ¶ 16. Witnessing the residual impacts of the attack on Sarri negatively affects Judith to this day. *Id.* Like Sarri's father, *see* R. Singer Decl. ¶ 31, Judith cannot "put to rest" her fear that Sarri will be injured when travelling, *see id.* ¶¶ 21; 23, 25. Merely thinking about the bombing makes Judith anxious and sad, *see id.* ¶ 22, and she herself finds being "near or on a bus" upsetting and has "developed a fear of going through tunnels." *See id.* ¶ 20.

### D. Procedural Background

Plaintiffs filed this lawsuit on October 8, 2021. *See* Compl. at 14. Plaintiffs' subsequent motion to waive Local Civil Rule 5.1(c), which would have required plaintiffs to include plaintiffs' full residential address in the caption of the pleading, *see* Pls.' Ex Parte Mot. for Waiver of Local Civ. Rule 5.1(c), ECF No. 2, was granted on October 12, 2021, *see* Minute Order (October 12, 2021), and plaintiffs then filed their addresses under seal on October 12, 2021, *see* Names and Addresses of All Plaintiffs, ECF No. 5.

Iran was properly served under the FSIA and, after failing to appear, the Clerk of the Court entered default against Iran on October 21, 2022. *See* Clerk's Entry of Default, ECF No. 16. Plaintiffs subsequently moved for default judgment as to liability and damages on December 6, 2023. *See* Pls.' Mot. at 1. Plaintiffs filed their declarations and exhibits with that motion. *Id.* Plaintiffs' motion for default judgment is now ripe for resolution.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 55(b)(2) permits a court to consider entering a default judgment when a party applies for that relief. *See* FED. R. CIV. P. 55(b)(2). Nevertheless,

"strong policies favor resolution of disputes on their merits" and, therefore, "'[t]he default judgment must normally be viewed as available only when the adversary process has been halted because of an essentially unresponsive party.'"  *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980) (quoting *H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir. 1970)).  Furthermore, "entry of a default judgment is not automatic," *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005) (footnote omitted), and thus the procedural posture of a default does not relieve a federal court of its typical obligations, including its "affirmative obligation" to determine whether it has subject-matter jurisdiction over the action, *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996).  Additionally, "a court should satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant." *Mwani*, 417 F.3d at 6.

When default judgment is sought under the FSIA, a claimant must also "establish[] his claim or right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e).  This requirement "provides foreign sovereigns a special protection akin to that assured the federal government by Fed. R. Civ. P. 55([d])." *Jerez v. Republic of Cuba*, 775 F.3d 419, 423 (D.C. Cir. 2014); *see also* H.R. REP. No. 94-1487, at 26 (1976) (stating that § 1608(e) establishes "the same requirement applicable to default judgments against the U.S. Government under [R]ule 55([d])"). While the "FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide," courts must be mindful that Congress enacted § 1605A, FSIA's terrorism exception, and § 1608(e) with the "aim[] to prevent state sponsors of terrorism—entities particularly unlikely to submit to this country's laws—from escaping liability for their sins." *Han Kim v. People's Democratic Republic of Korea*, 774 F.3d 1044, 1047–48 (D.C. Cir. 2014) (quoting 28 U.S.C. § 1608(e)); *see also Maalouf v. Islamic Republic of Iran*,

10

923 F.3d 1095, 1114 (D.C. Cir. 2019).  With this objective in mind, the D.C. Circuit has

instructed that "courts have the authority—indeed, we think, the obligation—to 'adjust

evidentiary requirements to . . . differing situations.'"  *Han Kim*, 774 F.3d at 1048 (quoting

*Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981)) (formatting modified).

Generally, courts in FSIA default actions must draw their "findings of fact and

conclusions of law from admissible testimony in accordance with the Federal Rules of

Evidence."  *Id.* at 1049 (quoting *Daliberti v. Republic of Iraq*, 146 F. Supp. 2d 19, 21 n.1

(D.D.C. 2001)).  Courts take uncontroverted factual allegations that are supported by admissible

evidence as true.  *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015)

("Courts may rely on uncontroverted factual allegations that are supported by affidavits." (citing

*Rimkus*, 750 F. Supp. 2d at 171)); *accord Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311,

319 (D.D.C. 2014); FED. R. CIV. P. 56(e)(2) (authorizing court to "consider the fact undisputed

for purposes of the motion" when adverse party "fails to properly address another party's

assertion of fact").

The D.C. Circuit's "review of findings underlying a default judgment in a FSIA case of

this sort is 'lenient.'"  *Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 356 (D.C. Cir. 2018)

(quoting *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017)), as "the courts are

granted broad discretion to determine what degree and kind of evidence is satisfactory."

*Maalouf*, 923 F.3d at 1114 (citing *Han Kim*, 774 F.3d at 1047; *Owens*, 864 F.3d at 785).  In

particular, "[i]n a FSIA default proceeding, a factual finding is not deemed clearly erroneous if

there is an adequate basis in the record for inferring that the district court . . . was satisfied with

the evidence submitted."  *Owens*, 864 F.3d at 785 (second alteration in original) (internal

quotation marks omitted).

## III.    DISCUSSION

A default judgment may be entered when (1) the court has subject-matter jurisdiction over the claims, (2) personal jurisdiction is properly exercised over the defendant, (3) the plaintiffs have presented satisfactory evidence to establish their claims against the defendant, and (4) the plaintiffs have satisfactorily proven that they are entitled to the monetary damages they seek.  These requirements are satisfied here and addressed in order below.

### A.  Subject-Matter Jurisdiction under the FSIA

"The district courts . . . have original jurisdiction" over "any nonjury civil action against a foreign state" seeking "relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title."  28 U.S.C. § 1330(a).  The FSIA defines a "foreign state" to include "a political subdivision of a foreign state or an agency or instrumentality" thereof.  28 U.S.C. § 1603(a).  Plaintiffs seek *in personam* relief, raising the key question whether defendant is entitled to immunity under the "state sponsor of terrorism" exception set forth in §1605A.[4]

"[T]he FSIA establishes a general rule granting foreign sovereigns immunity from the jurisdiction of United States courts," *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 13 (D.C. Cir. 2015) (citing 28 U.S.C. § 1604), but "that grant of immunity is subject to a number of exceptions," *id.* at 13–14; *Doe v. Taliban*, No. 22-7134, 2024 WL 1814317, at *2 (D.C. Cir. Apr. 26, 2024).  Among those exceptions is the "terrorism exception," enacted "[i]n 1996, [when] Congress withdrew foreign sovereign immunity for lawsuits that seek money damages for

---

[4]    This suit falls beyond the ten-year statute of limitations for actions brought under the FSIA's terrorism exception, *see* 28 U.S.C. § 1605A(b), but the "limitation period in § 1605A(b) is not jurisdictional," and defendant has "forfeited its affirmative defense . . . by failing to raise it in" this Court, *Owens*, 864 F.3d at 805; *see also Maalouf*, 923 F.3d at 1115 (holding that a district court may not *sua sponte* raise a forfeited statute of limitations defense under 28 U.S.C. § 1605A(b)).

personal injury or death from a state sponsor of terrorism that has engaged in an 'act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources * * * for such an act[.]'" *Borochov v. Islamic Republic of Iran*, 94 F.4th 1053, 1058 (D.C. Cir. 2024) (quoting the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 221, 110 Stat. 1214, 1241); *see also Mark v. Republic of Sudan*, 77 F.4th 892, 895 (D.C. Cir. 2023).  Plaintiffs assert jurisdiction based on the FSIA's terrorism exception.  *See* Compl. ¶ 1; 28 U.S.C. § 1605A.

In addition to creating "a cause of action for U.S. citizens, members of the U.S. armed forces, and U.S. government employees who have been injured by foreign states' acts or sponsorship of terrorism," *Borochov*, 94 F.4th. at 1057 (citing 28 U.S.C. § 1605A(c)), the terrorism exception abrogates a foreign state's immunity when certain preconditions are met.  "First, the foreign state was designated a 'state sponsor of terrorism at the time [of] the act * * * or was so designated as a result of such act[.]'" *Id.* (citing 28 U.S.C. § 1605A(a)(2)(A)(i)(I)).  As the D.C. Circuit has explained, "[t]his designation provision allows the Executive Branch to regulate if and when a foreign sovereign may be haled into American courts to answer terrorism allegations." *Doe v. Taliban*, 2024 WL 1814317, at *13–14; *see also Owens*, 531 F.3d at 889–93 (situating the FSIA's delegation of authority to designate state sponsors of terrorism in the President's foreign-relations powers).  "Second, 'at the time [of] the act,' either a victim of the act or the claimant in the suit was an American national, a member of the U.S. armed forces, or an employee or contractor for the U.S. government acting within the scope of their employment." *Borochov*, 94 F.4th. at 1057 (citing 28 U.S.C. § 1605A(a)(2)(A)(ii)).[5]

---

[5]     A third precondition for the terrorism exception to apply is that "if 'the act occurred in the foreign state against which the claim has been brought,' the claimant gave the foreign state a 'reasonable opportunity' to arbitrate prior to filing a lawsuit," *Borochov*, 94 F.4th at 1057 (citing 28 U.S.C. § 1605A(a)(2)(A)(iii)), but the attack at issue here did not take place in Iran, so this requirement is inapplicable.

Plaintiffs satisfy each of the applicable elements here.  As stated *supra* in Part I.B, Iran

was designated a state sponsor of terrorism in 1984, nineteen years before the 2003 Egged Bus

No. 14A bombing.  All plaintiffs averred in sworn declarations that they were U.S. citizens at the

time of the attack.[6]  Finally, plaintiffs seek damages "for personal injury . . . that was caused by

an . . . extrajudicial killing" for which defendant provided "material support or resources."  28

U.S.C. § 1605A(a)(1); *see also Owens*, 864 F.3d at 778 ("[T]he plain meaning of § 1605A(a)

grants . . . jurisdiction over claims against designated state sponsors of terrorism that materially

support extrajudicial killings committed by nonstate actors").

More specifically, the bus bombing that plaintiffs allege caused their injuries was an

"extrajudicial killing" resulting in deaths and also the physical and emotional injuries to

American citizens.  The term "extrajudicial killing" in the FSIA's terrorism exception has the

"meaning given" in "the Torture Victim Protection Act of 1991," 28 U.S.C. § 1605A(h)(7),

which defines the term as "a deliberate killing not authorized by a previous judgment

pronounced by a regularly constituted court affording all the judicial guarantees which are

recognized as indispensable by civilized peoples," Pub. L. No. 102-256, § 3(a), 106 Stat. 73, 73

(1992) (codified at 28 U.S.C. § 1350 note § 3(a)).  The Egged Bus No. 14A bombing killed

"numerous innocent civilians . . . and injured many more."  *See Baxter*, 2019 LEXIS 243209, at

*34.  "Those who perished were killed not according to the judgment of a regularly constituted

court but instead the malicious design of the Hamas terrorists who carried out the attack[]."  *Id.*

Thus, the bombing qualifies as an "extrajudicial killing[] as defined by the FSIA."  *Id.*

Furthermore, this Court takes judicial notice of the evidence presented in *Linde* and

*Baxter*, demonstrating that defendant provided "material support or resources" for this

---

[6]        S. Singer Decl. ¶ 2; R. Singer Decl. ¶ 1; E. Singer Decl. ¶ 1; J. Singer Decl. ¶ 1.

extrajudicial killing.  The evidence in those cases, described *supra* in Part I.A–B, shows that defendant encouraged Hamas to carry out these bombings, and provided substantial funding, training, and supplies to the organization.  This establishes that defendant's actions were "a 'substantial factor' in the sequence of events that led to the plaintiff[s'] injur[ies]" and that the injuries were "'reasonably foreseeable or anticipated as a natural consequence' of the defendant's conduct."  *Owens*, 864 F.3d at 794 (quoting *Rothstein v. UBS*, 708 F.3d 82, 91 (2d Cir. 2013)) (explaining that the jurisdictional standard for causation under the FSIA's terrorism exception is proximate cause).

Accordingly, under 28 U.S.C. § 1605A, defendant is not immune from this suit, and subject-matter jurisdiction may be properly exercised.  *See* 28 U.S.C. § 1330(a).

### B.  Personal Jurisdiction under the FSIA

"Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction . . . where service has been made under section 1608 of [the FSIA]."  28 U.S.C. § 1330(b).  Section 1608 first prescribes two methods by which service shall ordinarily be made, *see* 28 U.S.C. § 1608(a)(1)–(2), but these methods were "not available" to plaintiffs in this action, *Holladay v. Islamic Republic of Iran*, 406 F. Supp. 3d 55, 61 (D.D.C. 2019); *see also Frost v. Islamic Republic of Iran*, 383 F. Supp. 3d 33, 49 (D.D.C. 2019), as "defendant[] ha[s] neither made a special arrangement for service with the plaintiffs nor entered into any international convention governing service," *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 78 (D.D.C. 2017).

Plaintiffs attempted service under § 1608(a)(3) by sending two copies of the summons, complaint, notice of suit, and the FSIA, along with a translation of each into Iran's official language by certified or registered mail to Iran's Ministry of Foreign Affairs.  *See* Aff.

Requesting Foreign Mailing, ECF No. 12.  Plaintiffs then transmitted the same documents under the cover of diplomatic notes, following the procedure for service provided by 28 U.S.C. § 1608(a)(4), and Iran was thus served on July 11, 2022.  *See* Return of Service/Aff. of Summons and Complaint Executed, ECF No. 14.  On August 23, 2022, the U.S. Department of State certified in an Affidavit of Service that the requirements for diplomatic service under 28 U.S.C. § 1608(a)(4) were met by causing delivery of a Summons, Complaint, and Notice of Suit to Iran on July 11, 2022.  *See id.*

Accordingly, this Court has personal jurisdiction over Iran because plaintiffs effectively executed service under 28 U.S.C. § 1608(a)(4).

### C.  Defendant's Liability

Plaintiffs seek relief under FSIA § 1605A(c), *see* Compl. ¶ 1, which creates a private right of action for  "personal injury or death," and provides that, "[i]n any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages," 28 U.S.C. § 1605A(c)(4).  Yet § 1605A(c) does not set out guidance on the substantive bases for liability that determine plaintiffs' entitlement to damages.  Consequently, courts "may rely on well-established statements of common law, found in state reporters, the Restatement of Torts, and other respected treatises, in determining damages under § 1605A(c)."  *Fraenkel*, 892 F.3d at 353; *see Est. of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 24 (D.D.C. 2009) (applying "general principles of tort law," such as the Restatement (Second) of Torts, to determine liability); *see also Roth*, 78 F. Supp. 3d at 399 (citing *Oveissi II*, 879 F. Supp. 2d 44, 54 (D.D.C. 2012)); *Worley*, 75 F. Supp. 3d at 335.  Defendant's liability is discussed in detail below.

### 1.  Sarri Singer

Sarri brings her claims under theories of assault, battery, and intentional infliction of emotional distress ("IIED").  Compl. ¶¶ 70–83.  As discussed in the damages section, Sarri may

recover under only one theory, *see, e.g.*, *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 297 (2002) ("[I]t 'goes without saying that the courts can and should preclude double recovery by an individual.'") (quoting *Gen. Tel. Co. of the Nw. v. EEOC*, 446 U.S. 318, 333 (1980)), but each theory of liability is nevertheless evaluated.

### a. *Assault and Battery*

Battery requires an act "intending to cause a harmful or offensive contact . . . or an imminent apprehension of such a contact," and that such a contact in fact "directly or indirectly results." RESTATEMENT (SECOND) OF TORTS § 13. "Harmful contact" causes a "physical impairment of the condition of another's body, or physical pain or illness." *Id.* § 15; *see also Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 76 (D.D.C. 2010) (defining these terms). Iran acted with the intent to cause harmful contact with the passengers of Egged Bus No. 14A when it materially supported the bus bombing. *See, e.g., Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 102 (D.D.C. 2017) (defining material support for terrorist attacks as acts intending to cause harm). Sarri was a passenger on Egged Bus No. 14A at the time of the bombing, *see* S. Singer Decl. ¶ 14, and suffered harmful physical contact from the explosive force of the blast, *see id.* ¶¶ 20–25 (detailing the injuries to Sarri's shoulder, eye, face, ears, and legs). Therefore, Iran is liable to Sarri for battery.

Assault occurs where a defendant "acts intending to cause a harmful or offensive contact with the person of the other . . . or an imminent apprehension of such a contact, and . . . the other is thereby put in such imminent apprehension." RESTATEMENT (SECOND) OF TORTS § 21(1). "[A]cts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of further harm," so where plaintiffs averred "that they did, in fact, fear such harm because of the attack," defendant may be held liable for assault. *Murphy v. Islamic Republic of Iran*, 740 F.

Supp. 2d 51, 73 (D.D.C. 2010); *see also Valore*, 700 F. Supp. 2d at 76 (same).  Imminence is defined as being "so close to striking distance that [one] can reach the other almost at once." RESTATEMENT (SECOND) OF TORTS § 29 cmt. 2.  Everyone on Egged Bus No. 14A "seated and standing around" Sarri had been "instantly killed" by the suicide bombing.  S. Singer Decl. ¶ 19. Sarri therefore was within "striking distance" of the bombing.  Furthermore, Sarri herself suffered severe physical injuries, and could not see or hear well immediately following the explosion.  *See id.* ¶¶ 21, 23.  Thus, Sarri was "put in . . . imminent apprehension" of further "harmful or offensive contact" by the defendant due to how vulnerable the blast rendered her. Defendant is therefore liable to Sarri for assault.

### b.    *Intentional Infliction of Emotional Distress*

"[O]ne who by extreme and outrageous conduct intentionally or recklessly cause[d] severe emotional distress to" a plaintiff is liable for intentional infliction of emotional distress." RESTATEMENT (SECOND) OF TORTS § 46(1); *see also Heiser II*, 659 F. Supp. 2d at 26.  "Acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress."  *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009); *see also Valore*, 700 F. Supp. 2d at 77 (same).  Sarri has demonstrated through her sworn statement that she suffered severe emotional and psychological harms as a result of the attack. *See* S. Singer Decl. 31, 33, 45–46 (describing the immediate and lasting negative psychological impacts of the bombing).  Defendant is thus liable to Sarri for IIED.

### 2.  *Sarri's Family Members*

The remaining three plaintiffs—Robert Singer, Eric Singer, and Judith Singer—seek to collect damages as immediate family members of Sarri Singer for the bombing.

The family members' theory of liability is IIED.  Compl. ¶¶ 79–83 (Third Claim for Relief).  The Restatement permits recovery for those who were not a direct target of a

18

defendant's conduct if (1) "the defendants' conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person [who] is not present" and (2) the claimant is a member of a victim's immediate family, *Heiser II*, 659 F. Supp. 2d at 26–27 (quoting DAN B. DOBBS, THE LAW OF TORTS § 307, at 834 (2000)), or the functional equivalent of an immediate family member, *see Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 337 (D.C. Cir. 2003) (extending liability under the FSIA for IIED to "members of the victim's household" who were also "viewed as the functional equivalents of immediate family members"); *see also* RESTATEMENT (SECOND) OF TORTS § 46, cmt. *l* (leaving "open the possibility of situations in which presence . . . may not be required").

All three plaintiffs are immediate family members—parents and sibling—of the victim, and thus able to maintain claims for IIED.  *See Fritz*, 324 F. Supp. 3d at 63 (observing that the "strict meaning" of immediate family is "one's spouse, parents, siblings, and children" (quoting *Heiser II*, 659 F. Supp. 2d at 28)).  All three plaintiffs also demonstrated through their sworn statements that they suffered severe emotional harms as a result of the attack.  *See* R. Singer Decl. ¶¶ 13, 19, 35; E. Singer Decl. ¶¶ 11–12, 22–24; J. Singer ¶¶ 7, 9, 13.  Both Robert, Sarri's father, and Eric, Sarri's brother, rushed to Israel when they heard about Sarri being injured in the bombing and saw first-hand the extent of her injuries.  R. Singer Decl. ¶ 16, E. Singer Decl. ¶ 10.  Robert was "very stress[ed]" and "emotionally drain[ed]" after finding out that Sarri had been injured in a terrorist attack.  R. Singer Decl. ¶ 13.  Seeing her "bandaged up and clearly injured" in the hospital made Robert feel helpless, distraught, and "traumati[zed]."  *Id.* ¶ 19.  Eric also noted that "[i]t was extremely difficult" to see Sarri in her injured state, *see* E. Singer Decl. ¶ 11, and that the attack "really reinforced and intensified" his fear of travelling to Israel, *id.* ¶ 24.  Judith, Sarri's mother, felt "very distress[ed]" and "helpless" when she was unable to see Sarri

after the attack, *see* J. Singer Decl. ¶ 9, and feels "horrible" whenever she thinks about the attack, *id.* ¶ 22.  Therefore, the defendant is liable to these plaintiffs for IIED.

In summary, the victim-plaintiff and the family member plaintiffs established the defendant's liability under the federal private right of action against state sponsors of terrorism, 28 U.S.C. § 1605A(c), for the torts of battery, assault, and IIED.

### D.  Damages

Turning to the allowable damages, the victim-plaintiff seeks compensatory damages for pain and suffering under 28 U.S.C. § 1605A(c).  Compl. ¶ 74.  The family member plaintiffs seek damages for IIED under 28 U.S.C. § 1605A(c).  *Id.* ¶ 82.  Plaintiffs also request punitive damages, *id.* ¶ 85, as well as prejudgment interest and costs, *id.* ¶¶ 86–87.  The damages award to which each plaintiff is entitled is described below.

### 1.  *Legal Standard for Damages Under Section 1605A(c)*

In actions brought under the FSIA's terrorism exception, foreign states may be liable for money damages, including "economic damages, solatium, pain and suffering and punitive damages."  28 U.S.C. § 1605A(c).  To recover, plaintiffs "must prove that the consequences of the foreign state's conduct were reasonably certain (i.e., more likely than not) to occur, and must prove the amount of damages by a reasonable estimate."  *Roth*, 78 F. Supp. 3d at 402 (internal quotation marks omitted); *see also Fraenkel*, 892 F.3d at 353 (stating the same).  Courts may look to expert testimony and prior awards in determining whether the amount of damages has been proven by a reasonable estimate.  *See Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012); *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 29 (D.D.C. 2008).  The D.C. Circuit "review[s] the District Court's FSIA damages awards for abuse of discretion."  *Fraenkel*, 892 F.3d at 356.

The evidence presented in *Linde* and *Baxter*, of which this Court has taken judicial notice and reviewed above *supra* Part I.A–B, has satisfactorily shown that plaintiffs' injuries were reasonably certain and were the intended consequences of defendant's material support of Hamas.  Having concluded this, whether plaintiffs have shown the amount of pain and suffering and punitive damages by a reasonable estimate will be considered next.

### 2.  *Pain and Suffering*

As discussed, defendant is liable to the victim-plaintiff for battery, assault, and IIED, but the bar on multiple recoveries allows this plaintiff to recover only under one theory, for the single underlying harm.  *See, e.g.*, *Valore*, 700 F. Supp. 2d at 77 ("The Court notes that these plaintiffs who have claimed assault, battery, and IIED may recover under only one of any such theories, as multiple recovery is prohibited.").  Within this single-recovery framework, the "baseline assumption," *Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 35 (D.D.C. 2016), applied in previous cases under the FSIA's terrorism exception is that "persons suffering injuries in terrorist attacks are entitled to $5 million in damages."  *Id.* (quoting *Davis v. Islamic Republic of Iran*, 882 F. Supp. 2d 7, 12 (D.D.C. 2012)).  The baseline may be adjusted either upward or downward.  An upward departure would be warranted "in the presence of 'severe instances of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic . . . or were mistaken for dead.'"  *Id.* at 35–36 (quoting *Valore*, 700 F. Supp. 2d at 84).  A downward departure would be warranted "in the face of 'minor shrapnel injuries or minor injury from small-arms fire.'"  *Id.* at 36 (quoting *Valore*, 700 F. Supp. 2d at 84).

Pain and suffering damages are by their nature difficult to quantify.  Nevertheless, a review of the victim-plaintiff's sworn statement demonstrates that she suffered severe physical

injuries and chronic psychological pain.  *See* S. Singer Decl. ¶¶ 20–25, 45, 49 (describing how

the explosion and shrapnel broke her collarbone, burned her face and hair, burst her eardrums,

misaligned her teeth, and left her with post-traumatic stress disorder).  Thus, the victim-plaintiff

is entitled to the baseline assumption award of $5,000,000 for the significant physical injuries

she sustained as a result of the bombing and the psychological symptoms she has suffered since.

An upward departure is not warranted because the victim-plaintiff has regained most of her

physical and mental faculties, *see id.* ¶¶ 63–64, and because the victim-plaintiff's injuries

resemble those of other victims of terrorism who received baseline awards, *see Thole v. Islamic

Republic of Iran*, No. 23-793, 2024 WL 2208208, at *14 (D.D.C. 2024).[7]

### 3.  *Intentional Infliction of Emotional Distress*

The family member plaintiffs seek damages under an IIED theory to compensate for the

emotional distress they experienced as family members of the victim-plaintiff.  Compl. ¶ 82

(Third Claim for Relief).  "Under the FSIA, a claim for solatium is nearly indistinguishable from

a claim for IIED."  *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 115 (D.D.C. 2015)

(Contreras, J.); *see also Fraenkel*, 892 F.3d at 357.  "[S]olatium is traditionally a compensatory

damage which belongs to the individual heir personally for injury to the feelings and loss of

decedent's comfort and society," *Fraenkel*, 892 F.3d at 356 (quoting *Flatow v. Islamic Republic

of Iran*, 999 F. Supp. 1, 29 (D.D.C. 1998)), but solatium damages have also been awarded to

compensate for the emotional distress of the family members of surviving victims, *Wultz v.

Islamic Republic of Iran*, 864 F. Supp. 2d 24, 39 (D.D.C. 2012) (explaining that "in the context

---

[7]     Plaintiff Sarri Singer also seeks economic damages for her assault and battery claims in the complaint, *see*
Compl. ¶¶ 74, 78, as permitted by the FSIA, *see* 28 U.S.C. § 1605A(c), but as she does not provide any support for
an amount of economic damages in either the plaintiffs' motion for default judgment or her accompanying
declaration, economic damages will not be granted in this case.  *See Moradi v. Islamic Republic of Iran*, 77 F. Supp.
3d 57, 71 (D.D.C. 2015).

of distress resulting from injury to loved ones—rather than death—courts have applied a framework where awards are valued at half of the awards to family members of the deceased" (internal quotation marks omitted)); *see also Valore*, 700 F. Supp. 2d at 85 ("Relatives of surviving servicemen received awards valued at half of the awards to family members of the deceased."). Damages recoverable on immediate-family member plaintiffs' claims of IIED thus will be discussed as a claim for solatium damages.

"Mental anguish, bereavement and grief resulting from" an immediate family member's death or injury "constitutes the preponderant element of a claim for solatium." *Fraenkel*, 892 F.3d at 356–57 (alteration adopted) (quoting *Flatow*, 999 F. Supp. at 30). In determining the appropriate amount to compensate victims' family members for emotional distress, "the Court may look to prior decisions awarding damages . . . for solatium." *Acosta*, 574 F. Supp. 2d at 29. Commonly accepted is the standardized framework for solatium damages in *Est. of Heiser v. Islamic Republic of Iran ("Heiser I")*, 466 F. Supp. 2d. 229, 269 (D.D.C. 2006). *See Roth*, 78 F. Supp. 3d at 403 (noting the "framework has been adopted by other courts as an appropriate measure of solatium damages for the family members of victims of state-sponsored terror" (citing *Valore*, 700 F. Supp. 2d at 85)). Although not mandatory, *see Fraenkel*, 892 F.3d at 361 ("There is no statutory basis for concluding that district courts *must* award solatium damages in the amounts that *Heiser* found commonly granted." (emphasis in original)), the *Heiser* framework is adopted here for consistency, *see also Akins*, 332 F. Supp. 3d at 43 (adopting the *Heiser* framework for awarding solatium damages); *Schooley*, 2019 WL 2717888, at *77 (same).

The *Heiser* framework, as a baseline, awards spouses of deceased victims $8,000,0000, parents and children of deceased victims $5,000,000, and siblings of deceased victims $2,500,000. *Valencia*, 774 F. Supp. 2d at 15. "[F]amilies of victims who have died are typically

awarded greater damages than families of victims who remain alive," *Heiser I*, 466 F. Supp. 2d at 269 (quoting *Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56, 75 (D.D.C. 2006)), and so the courts have awarded family members of surviving victims approximately half the baseline awards for family members of the deceased, *see Wultz*, 864 F. Supp. 2d at 39; *Valore*, 700 F. Supp. 2d at 85.  Here, then, the applicable baseline solatium awards are $4,000,000 to spouses of surviving victims and $2,500,000 to parents of surviving victims, *see Wultz*, 864 F. Supp. 2d at 39; "[c]hildren of a surviving victim receive $1.5 million on average," *Spencer v. Islamic Republic of Iran*, 71 F. Supp. 3d 23, 28 (D.D.C. 2014), and siblings of surviving victims receive $1,250,000, *see Valore*, 700 F. Supp. 2d at 85.

These numbers serve only as an anchor from which the Court should deviate to compensate for specific circumstances.  *See Fraenkel*, 892 F.3d at 362 ("While past solatium awards from comparable cases are appropriate sources of guidance for district courts, different plaintiffs (even under [the] FSIA) will prove different facts that may well (and should) result in different damage awards." (internal quotation marks omitted)).  "Decisions to deviate from the starting points provided by the *Heiser* framework are committed to the discretion of the particular court in each case."  *Oveissi v. Islamic Republic of Iran* ("*Oveissi I*"), 768 F. Supp. 2d 16, 26 (D.D.C. 2011); *see also Fraenkel*, 892 F.3d at 351 ("District Court judges have discretion . . . to grant solatium awards based on the particular facts of each case, subject to abuse-of-discretion review for errors of law, clearly erroneous factual findings, and faulty reasoning.").

Damages for Sarri Singer's parents are addressed first, followed by her sibling.

### a.  *Parents*

Two of the family member plaintiffs will receive an award as the parent of a victim of the Egged Bus No. 14A bombing: Robert Singer and Judith Singer.  Sarri, their daughter, was a

passenger on Egged Bus No. 14A when the explosion occurred.  *See* S. Singer Decl. ¶¶ 14, 18. She suffered serious physical and emotional injuries.  *See id.* ¶¶ 20–25.  Witnessing Sarri's injured state and helping her along her long road to recovery was difficult and distressing for both Robert and Judith.  *See* R. Singer Decl. ¶ 19; J. Singer Decl. ¶ 16.  Parents of victims are each entitled to a baseline award of $2,500,000 under the *Heiser* framework.  *See Akins*, 332 F. Supp. 3d at 44 (awarding $2,500,000 to the parents of injured service-members).  Here, both Robert and Judith Singer, whose child was awarded $5,000,000, will receive an award of $2,500,000.  No departure from the baseline is warranted because their harms are consistent with those suffered by many parents of victims of terrorism, *see Valencia*, 774 F. Supp. 2d at 16, and their damages are proportional to the damages awarded to their daughter, Sarri.

### b.  *Siblings*

The remaining plaintiff is a sibling of the victim-plaintiff: Eric Singer.  He has described distress upon learning about the bombing and ongoing negative emotional effects of the bombing on his sister Sarri.  *See* E. Singer Decl. ¶¶ 11, 19–20.  These harms are consistent with those suffered by many siblings of victims of terrorism.  *See Valencia*, 774 F. Supp. 2d at 15.  Within the *Heiser* framework, siblings of victims awarded between $5,000,000 and $7,000,000 are each entitled to an award of $1,250,000, with no downward departure for proportionality required. *See Akins*, 332 F. Supp. 3d at 45 (awarding a baseline amount of $1,250,000 to siblings of injured service-members).  Eric is thus entitled to an award of $1,250,000.

### E.  Punitive Damages

In addition to compensatory damages, plaintiffs seek punitive damages under 28 U.S.C. § 1605A(c).  Compl. ¶ 85 (Fourth Claim for Relief).  The Supreme Court has laid out three "guideposts" for "reviewing punitive damages" awards: "(1) the degree of reprehensibility of the

defendants' misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003) (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)).  Weighing this precedent, this Court has awarded "[p]unitive damages equal to compensatory damages" in light of the "identified flaws in the [other] methods" for determining punitive damages.  *See Christie v. Islamic Republic of Iran*, Civil Action No. 19-1289 (BAH), 2020 U.S. Dist. LEXIS 116378, at *87 (D.D.C. July 2, 2020). Specifically, *Christie* determined that this method avoided "a singular focus on deterrence," *id.* at *88–89, as well as "elevat[ing] superficial similarities over meaningful ones" and "skim[ing] over analysis of the plaintiffs' precise harms," and does not "yield an excessive award," *id.* Awarding punitive damages equal to compensatory damages, *Christie* concluded, was most appropriate because "plaintiffs [were] already receiving substantial compensatory awards," *id.* at *91, "'the compensatory damages for the injury suffered' . . . [were] 'based on a component which' would be 'duplicated in the punitive award,'" *id.* (quoting *State Farm*, 538 U.S. at 426), and "[a]dding hundreds of millions of dollars to [the] amount [of outstanding court judgments already owed by Iran] . . . [was] not likely to have a meaningful deterrent effect," *id.* at *93.

The *Christie* punitive damages approach analysis, which has likewise been applied in several other cases in this district, *see, e.g.*, *Blank v. Islamic Republic of Iran*, No. 19-CV-3645, 2021 WL 3021450, at *10 (D.D.C. July 17, 2021);  *Ackley v. Islamic Republic of Iran*, No. 20-CV-621, 2022 WL 3354720, at *60 (D.D.C. Aug. 12, 2022), will also be applied here.  Although plaintiffs urge this Court to adopt the framework employed in *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 105–06 (D.D.C. 2017) and multiply each plaintiff's compensatory award by

three to arrive at a punitive damages amount, *see* Pls.' Mem. ¶¶ 159–60, a punitive damages award equal to compensatory damages is most appropriate here.  Plaintiffs are already receiving substantial compensatory awards, *supra* Part III.D.2–3, and punitive damages above a one-to-one ratio to compensatory damages are unlikely to have an additional deterrent effect on Iran and would be excessive given the scope of plaintiffs' injuries.  Plaintiffs are thus entitled to a total punitive damages award of $11,250,000 to be apportioned according to their compensatory damages.  *See also Valore*, 700 F. Supp. 2d at 90 (apportioning in the same fashion).

### F.  Prejudgment Interest

Plaintiffs next seek prejudgment interest.  Compl. ¶ 87.  "Whether to award such interest is a question that rests within this Court's discretion, subject to equitable considerations." *Oveissi II*, 879 F. Supp. 2d at 58.  At the same time, the majority of Judges on this Court confronted with this issue have concluded—as this Court did in *Akins*—that "pain and suffering and solatium damages are both designed to be fully compensatory" and prejudgment interest is therefore unwarranted.  *See Barry v. Islamic Republic of Iran*, 437 F. Supp. 3d 15, 60 (D.D.C. 2020) (Contreras, J.) (quoting *Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216, 232 (D.D.C. 2012)); *see Doe A-1 v. Democratic People's Republic of Korea*, No. 18-cv-252 (DLF), 2021 WL 723257, at *9 (D.D.C. Feb. 24, 2021) (Friedrich, J.) (denying prejudgment interest because the award "in *today's dollars* fully compensates the crew members and their estates for their time spent in captivity" (emphasis in original)); *Bathiard v. Islamic Republic of Iran*, Case No. 16-cv-1549 (CRC), 2020 WL 1975672, at *8 (D.D.C. Apr. 24, 2020) (Cooper, J.) (holding "prejudgment interest is not appropriate for nonpecuniary damages already designed to provide complete compensation"); *Schertzman Cohen v. Islamic Republic of Iran*, No. 17-cv-1214 (JEB), 2019 WL 3037868, at *10 (D.D.C. Jul. 11, 2019) (Boasberg, J.) (denying prejudgment interest

because "direct-injury and solatium awards [are] to be fully compensatory" already); *Maupin v. Syrian Arab Republic*, 405 F. Supp. 3d 79, 94, 99 (D.D.C. 2019) (Spec. Master Report), *adopted by Maupin v. Syrian Arab Republic*, 405 F. Supp. 3d 75 (D.D.C. 2019) (Kollar-Kotelly, J.); *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 54–55 (D.D.C. 2016) (Howell, J.). Thus, the overarching tide of persuasive precedent in this District weighs against awarding prejudgment interest, and is even less warranted considering punitive damages are permissible in § 1605A cases, as prejudgment interest "does not apply to punitive damages because 'prejudgment interest is an element of complete compensation' and punitive damages are non-compensatory." *Thuneibat*, 167 F. Supp. 3d at 55 (quoting *Wultz*, 864 F. Supp. 2d at 42).

Consistent with this persuasive precedent, this Court concludes plaintiffs are not entitled to prejudgment interest on their compensatory or punitive damages. When denying prejudgment interest on compensatory damages in *Oveissi I*, Judge Lamberth explained that "[i]n adopting the *Heiser* framework, this Court determined that the values set by that scale represent the appropriate level of compensation, regardless of the timing of the attack." *Oveissi I*, 768 F. Supp. 2d at 30 n.12; *see also Maupin*, 405 F. Supp. 3d at 94; *Thuneibat*, 167 F. Supp. 3d at 54. Indeed, nonpecuniary damages for pain and suffering and solatium "do not typically require prejudgment interest because they are 'designed to be fully compensatory.'" *Id.* (quoting *Wyatt*, 908 F. Supp. 2d at 232). As in *Oveissi I*, where "the Court s[aw] no reason to deviate from its standard practice" of relying on "the values set by th[at] [*Heiser*] scale[, which] represent the appropriate level of compensation" and award prejudgment interest, *Oveissi I*, 768 F. Supp. 2d at 30 n.12, the instant plaintiffs "have not provided any reason why awards under [the *Heiser*] framework are insufficient to provide 'complete compensation,'" *Akins*, 332 F. Supp. 3d at 46 (quoting *West Virginia v. United States*, 479 U.S. 305, 310 (1987)). Plaintiffs are likewise not

entitled to prejudgment interest on their punitive damages. "[P]rejudgment interest does not apply to punitive damages because 'prejudgment interest is an element of complete compensation' and punitive damages are non-compensatory." *Thuneibat*, 167 F. Supp. 3d at 55 (quoting *Wultz*, 864 F. Supp. 2d at 42). Accordingly, plaintiffs are awarded monetary damages in the amounts established above without prejudgment interest.

## IV.    CONCLUSION

For the foregoing reasons, plaintiffs' motion for default judgment and damages is granted. Defendant is liable for the pain and suffering inflicted on Sarri Singer, IIED inflicted on her immediate family members, and for punitive damages equal to compensatory damages.

Plaintiffs are awarded compensatory and punitive damages in the total amount of $22,500,000, which is apportioned as follows:

1.     Victim-plaintiff Sarri Singer is entitled to $5,000,000 in pain and suffering damages and $5,000,000 in punitive damages;

2.     Plaintiff parents Robert Singer and Judith Singer are each entitled to $2,500,000 in damages for IIED and $2,500,000 in punitive damages;

3.     Plaintiff sibling Eric Singer is entitled to $1,250,000 in damages for IIED and $1,250,000 in punitive damages.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

DATE: June 17, 2024.

_____
**BERYL A. HOWELL**
United States District Judge